[L.A. No. 31837. Feb. 19, 1985.]

ZELVERN W. MANN, as Administrator, etc., et al.,
Plaintiffs and Appellants, v.
ANDREA CRACCHIOLO III et al., Defendants and Respondents.

24

COUNSEL

Kenneth Crews Mann and Bruce Ogden Mann, in pro. per., and for Plaintiffs and Appellants.

Rushfeldt, Shelley & McCurdy, Horvitz & Greines, Horvitz & Levy, Ellis J. Horvitz, S. Thomas Todd, Harrington, Foxx, Dubrow & Canter, Dale

B. Goldfarb, Mark W. Flory and Patty Mortl for Defendants and Respondents.

---

OPINION

BROUSSARD, J.—Plaintiffs, the surviving husband and three sons of Ada Crews Mann,[1] deceased, appeal from summary judgments in favor of defendants in this wrongful death action and from denial of postjudgment orders. Plaintiffs' complaint charged the UCLA Medical Center, 54 individual doctors, a radiology technician, the associate director of the hospital, and the hospital's data processing manager and finance director with breaking the decedent's neck, conspiring to conceal the existence of the broken neck, refusing to treat it, intentionally performing useless operations upon decedent to obtain Medicare and MediCal funds, and then attempting to kill her to conceal their complicity in causing and concealing the existence of the broken neck.

As might be expected when there are allegations such as these, the instant case has generated a great amount of hostility, personal clashes, side issues, and related litigation.[2] From July until October 1981, there were filings or hearings almost daily. The briefs filed herein continue to delve into side issues without always specifying their relevancy. We will set forth the facts relevant to the major issues in a brief manner, omitting facts bearing on side issues, numerous discovery motions, and motions to disqualify.

We review the court's order granting the motions for summary judgment.[3] In granting the summary judgment motions, Judge Peter S. Smith concluded that plaintiffs' opposition was not timely filed and therefore was not consid-

---

[1] Two of the sons are attorneys, and they represent themselves and the other two plaintiffs.

[2] During the course of the pretrial proceedings, plaintiffs attempted to disqualify a total of six superior court judges, Judges Choate, Rittenband, Cole, Chernow, Smith and Sumner. Eight petitions for extraordinary relief have been filed with the Court of Appeal. Several petitions for hearing have been denied by this court. Plaintiffs filed an action in the federal court naming three defense counsel, their firm, four judges and a special master as defendants charging that the defendants were conspiring to deprive plaintiffs of their rights under the federal Constitution. Judgment of dismissal was affirmed with sanctions. While this appeal was pending, plaintiffs filed another federal court action—this time against five of the doctor defendants and the administrator of the UCLA Medical Center. The action was dismissed with an award of attorney fees to the defendants, and the dismissal was affirmed with the award upheld on the ground that the action was frivolous.

[3] One of the defendant doctors' motions for summary judgment was granted in March and another in July 1981. Those motions will be discussed later in this opinion. The discussion in the first portion relates to the motions of the remaining defendants heard on October 15, 1981. Unless otherwise indicated the term defendants refers only to the latter defendants.

ered. He also determined that even if plaintiffs' opposition had been considered, it was insufficient to raise a triable issue of fact because the doctor's declaration offered in opposition to the motion lacked the requisite foundational facts to qualify him to testify as to the standard of care and tended to "shotgun his opinions in a conclusionary way." The court also concluded that at most plaintiffs' declaration would make out a claim for medical negligence and would not justify the claim for punitive damages. The summary judgment was filed October 26, 1981.

### THE COURT OF APPEAL STAY AND THE TIMELINESS OF PLAINTIFFS' OPPOSITION TO THE SUMMARY JUDGMENT MOTIONS

In January 1981, the trial court granted plaintiffs' motion for trial preference on the ground that one of them was over age 70 and set trial for August 31, 1981. On May 1, the case was assigned to Judge Smith for all pretrial proceedings. On June 4, defendants filed a demand for a list of plaintiffs' expert witnesses to be served no later than July 12. On the latter date, plaintiffs furnished the list, and defendants in mid-July noticed the depositions of the experts. On August 11, defendants' motion to continue the trial date was granted, and trial was set for October 26.

On August 26, plaintiffs filed an affidavit of bias against Judge Smith. On September 2, Judge Smith filed an answer and transferred the case to another department. Judge Rickles of Orange County ruled on September 18 that Judge Smith was not disqualified. After Judge Smith rejected another attempt to disqualify him, plaintiffs, on September 24, filed a petition for extraordinary relief in the Court of Appeal challenging Judge Rickles' ruling and Judge Smith's order striking the second motion to disqualify him.

On the same day the Court of Appeal issued the following temporary stay: "In order that this court may have an opportunity to consider [the] within petition, IT IS HEREBY ORDERED that all proceedings . . . are stayed pending determination of the within petition or until further order of this court."[4]

On October 5, defendants served and filed 11 motions for summary judgment or for orders specifying issues as without substantial controversy. The motions were noticed for hearing on October 15.

---

[4]On October 1, plaintiffs filed another petition for extraordinary relief in the Court of Appeal, which like an earlier petition, sought to disqualify the special master appointed to preside at depositions, retired Judge Joseph Wapner, and to vacate Judge Eagleson's order that depositions be held in the courthouse in the presence of a bailiff. The petition was denied, and we denied a petition for hearing.

On October 6, plaintiffs filed a petition in the Court of Appeal for writ of prohibition to prevent hearing on the summary judgment motions claiming that the motions were in violation of the stay. On October 8, the Court of Appeal denied the petitions of September 28 and October 6, and terminated the temporary stay forthwith. On the same day plaintiffs were notified by telephone that the stay had been lifted. On October 13, Judge Smith issued a minute order that all pending motions in the case, including summary judgment motions, would be heard as scheduled on October 15.

Plaintiffs filed their opposition on October 13, relying upon the October 7 declaration of J. DeWitt Fox, M.D., whose name had not been included in the list of experts furnished to defendants in July. Defense counsel had not received copies of the opposition at the time of hearing on October 15. Although two defense counsel went to court to read its copy on the 14th, a third did not, and the hearing was recessed to permit him to read the opposition papers.

After the recess, the hearing continued involving numerous motions, as well as the summary judgment motions. Plaintiffs did not claim that the summary judgment motions filed while the stay was in force were invalid. After defense counsel claimed that the opposition was untimely and Judge Smith had expressed concern that defense counsel had not received the opposition papers, plaintiffs suggested a continuance to permit defense counsel to further review the papers, but the trial court stated it would not continue the proceedings. Aside from the above statement by plaintiffs they did not suggest a continuance.

■■ At the outset the parties dispute whether the stay of "all proceedings" issued by the Court of Appeal precluded the filing of the summary judgment motions and whether further proceedings were defective. Whether "all proceedings" should be read as referring to all court actions only or as including actions by the parties presents an interesting question, but we need not reach it. Plaintiffs chose to appear and argue the merits of the summary judgment motions and did not challenge the filing of the motions at the hearing of the motions. "It is well settled that the appearance of a party at the hearing of a motion and his or her opposition to the motion on its merits is a waiver of any defects or irregularities in the notice of the motion. [Citations.]" (*Tate* v. *Superior Court* (1975) 45 Cal.App.3d 925, 930 [119 Cal.Rptr. 835]; *Lacey* v. *Bertone* (1949) 33 Cal.2d 649, 651-652 [203 P.2d 755].)

■ Plaintiffs urge that the trial court erred in refusing to consider the opposition papers on grounds that they were not timely filed. Rule 16, subdivision B of the Law and Motion Rules of the Los Angeles County Superior

Court provides: "B. All papers, other than those initiating the proceedings, whether in opposition or support, shall be filed directly with the court clerk in the law and discovery department in which the matter is pending at least five calendar days but in no event later than 4:30 p.m. of the third court day preceding the scheduled hearing or they will not be considered, unless time is shortened by order of the court."

Monday, October 12, 1981, was a holiday; therefore, the third court day preceding the scheduled hearing was Friday, October 9, 1981. As pointed out above, plaintiffs mailed their papers to defense counsel on October 12 and filed with the court on October 13.[5]

Pointing out that Code of Civil Procedure section 437c provides that summary judgment motions may be made on 10 days' notice but is silent as to the time to file counteraffidavits, the court in *Albermont Petroleum Ltd.* v. *Cunningham* (1960) 186 Cal.App.2d 84, 93 [9 Cal.Rptr. 405], concluded as an alternate ground of decision that a local rule like rule 16 which restricts the time for opposing affidavits is void and unenforceable. The court also pointed out that the summary judgment remedy is "unusual and drastic" and for this reason should be used with caution to safeguard the right to trial with any doubt as to the granting of the motion resolved in favor of the opposing party. (186 Cal.App.2d at p. 92.)

The holding of *Albermont* was rejected in *Shadle* v. *City of Corona* (1979) 96 Cal.App.3d 173, 178-179 [157 Cal.Rptr. 624], where the court reasoned that, had the Legislature intended to grant parties opposing summary judgment the right to file opposition to the summary judgment motion up to and including the hearing, it would have said so and that in the absence of legislative direction the time for filing opposition is subject to court rule. The court points out that last minute filings will often interrupt and delay hearings while the parties and the court study the documents.

A third view was expressed recently in *Kapitanski* v. *Von's Grocery Co.* (1983) 146 Cal.App.3d 29, 32-33 [193 Cal.Rptr. 839]: " 'Local court rules and policies have the force of procedural statutes, so long as they are not contrary to legislative enactments. [Citations.]' (*Shadle* v. *City of Corona* (1979) 96 Cal.App.3d 173, 177 [157 Cal.Rptr. 624].) . . . Judges . . . generally prefer to avoid acting as automatons and routinely reject requests by counsel to function solely in a ministerial capacity. Rigid rule following is not always consistent with a court's function to see that justice is done.

---

[5]Plaintiffs have not argued that the filing was timely under Code of Civil Procedure sections 12 and 12a extending time for performance of an act when the last day for performance is a holiday.

Cognizant of the strong policy favoring the disposition of cases on their merits (*Weitz* v. *Yankosky* (1966) 63 Cal.2d 849, 854-855 [48 Cal.Rptr. 620, 409 P.2d 600]; *Slusher* v. *Durrer* (1977) 69 Cal.App.3d 747, 753-754 [138 Cal.Rptr. 265]), judges usually consider whether to exercise their discretion in applying local court rules and frequently consider documents which have been untimely filed. Judges are well aware of the unnecessary burdens placed on courts and counsel when strict compliance with local procedural rules results in the expenditure of unnecessary time and money for the preparation of later section 473 motions. . . .

"In applying the statutory grounds for relief under section 473 trial courts must consider the specific contexts in which such motions arise and should employ a flexible rather than rigid or formalistic approach to decisionmaking. Even without an empirical study it is apparent that appellate courts are more inclined to affirm orders resulting in trials on the merits than orders denying relief from defaults. (*Weitz* v. *Yankosky, supra,* 63 Cal.2d at p. 854; *Slusher* v. *Durrer, supra,* 69 Cal.App.3d at p. 753.) An attorney's neglect in untimely filing opposing papers must be evaluated in light of the reasonableness of the attorney's conduct. (*Robinson* v. *Varela* (1977) 67 Cal.App.3d 611, 615-616 [136 Cal.Rptr. 783].) In circumstances such as those present here trial courts must also consider the propriety of strictly enforcing local procedural rules. The salutary purpose of such rules regulating the filing of opposing papers is to '. . . ensure that the court and the parties will be familiar with the facts and the issues so that meaningful argument can take place and an informed decision rendered at the earliest convenient time.' (*Shadle* v. *City of Corona, supra,* 96 Cal.App.3d at pp. 178-179.) Also pertinent are the effects of strict enforcement on the rights of the parties and the furtherance of justice. (*Slusher* v. *Durrer, supra,* 69 Cal.App.3d at pp. 754-755; see also *Albermont Petroleum, Ltd.* v. *Cunningham* (1969) 186 Cal.App.2d 84, 90 [9 Cal.Rptr. 405].)"

██ ██ We agree with the view expressed in *Shadle* and *Kapitanski* that in the absence of legislative direction to the contrary courts may adopt local rules with the force of law and that reasonable local rules limiting the time to file opposition to the summary judgment motion were not precluded by former Code of Civil Procedure section 437c.[6] ██ Interruption and delay of hearings which such rules are designed to prevent justify court management of its procedures. However, weighing the potential for interruption and delay against the policy in favor of disposition of cases on their merits, the drastic nature of the summary judgment remedy, and the poten-

---

[6]In 1983, Code of Civil Procedure section 437c was amended to provide that the motion for summary judgment must be made at least on 28 days' notice rather than 10 and that opposition papers must be filed 14 days before the hearing unless the court for good cause orders otherwise. (Stats. 1983, ch. 490, § 1.)

tially short time available to respond to the summary judgment motion, we are satisfied that courts were required to exercise their discretion and relieve the attorney from tardy opposition filings when his conduct was reasonable, as pointed out in *Kapitanski*. If the court concluded that the tardy filing of opposition papers would prejudice the moving party or other parties, it could continue the hearing requiring the tardy party to pay reasonable costs. (See Code Civ. Proc., §§ 473, 594a, 1024.) Rule 16, subdivision B of the Law and Motion Rules contemplates that the trial court may exercise its discretion in enforcing it by providing that the court may shorten the three-day period before hearing during which opposition may not be filed.

In the circumstances of the instant case, the trial court abused its discretion in enforcing the three-day limitation by refusing to consider the opposition rather than shortening the time or continuing the hearing. The motions were made on 10 days' notice. The motions and their supporting materials comprise over 800 pages. There were several other motions in the case set for the same day for which counsel was required to prepare. Plaintiffs' points and authorities in opposition to the motion comprise 30 pages, and Dr. Fox's declaration with its attached report is 15 pages in length. As we have seen, the summary judgment motions were made on October 5, and under the rule—because of the weekend and the holiday under the superior court's approach—compliance with the local rule would have required filings on October 9, four days later. A stay was in effect until October 8. Compliance with the local rule obviously would have required Herculean efforts.

The clerk filed the untimely opposition. While it is true that plaintiffs did not make a formal motion for continuance at the hearing, it was apparent from the trial court's statement—in response to plaintiffs' suggestion of a continuance—that it would not grant a continuance. It was also apparent that the court was prepared to consider the merits of the motion and the showing made in favor and in opposition and that the tardiness of the filing of the opposition had not interfered with its ability to fully consider the motion. At the hearing the trial court proceeded to permit argument on the merits of the summary judgment motion and the showing in opposition both before and after the violation of rule 16 was called to its attention. The trial court subsequently ruled on the showing in opposition, and its determination that tardy filing precluded consideration contradicts the record.

Thus, it is clear that the fact that the showing in opposition was filed two rather than three days prior to the hearing did not preclude full consideration of the opposition. In view of time burdens created by the stay, the lengthy motions and supporting documents, and the fact that the judge was fully prepared to, and did, consider the opposition to the motion, we conclude

that the trial court erred in ruling that the opposition to the motion could not be considered.

## THE CONTENTS OF DR. FOX' DECLARATION

■■ ■■ The trial court also rejected Dr. Fox' declaration on the grounds that it lacked the requisite foundational facts to qualify him to testify about the standard of care and tended to "shotgun his opinions in a conclusionary way." While we agree that Dr. Fox' declaration was conclusionary in a number of respects, the declaration contains several factual assertions establishing triable issues of fact and precluding its rejection. We also conclude that Dr. Fox was qualified to testify about the standard of care.

Dr. Fox' summary of decedent's medical records outlining the treatment administered is not challenged but is reinforced by the defense showing. On November 1, 1977, decedent went to the UCLA radiology department as an outpatient for X-rays of her toes preparatory to surgery for rheumatoid arthritis of the joints of her toes. She fell and struck her head. A skull series was taken. She returned to the hospital in December, and the surgery was performed. On January 10, she was rehospitalized because of some infections in the incisional sites of the foot. The next day X-rays were taken including X-rays of the cervical spine. In September and October 1978, she was again in the hospital because of infection in her foot, and during this period she was treated for rheumatoid arthritis, dislocated hip, respiratory difficulties, and apparently she was given a pacemaker. She was removed to St. Joseph Hospital at the request of her family on November 9 where she was discharged on November 17. She returned to St. Joseph Hospital a week later, and she died March 26, 1979. An autopsy revealed that the cause of death was a fracture of the odontoid process with spinal cord damage.

The motions for summary judgment of the defendant physicians, including the radiologists, and of Holly Hoberg, a radiology technician, were supported by the declarations of the moving parties, the declaration of D. M. Forrester, M.D., and portions of the deposition of George Campion, M.D.

In addition, the motion of defendant Richard D. Ferkel, M.D., a general surgeon, was also supported by the declaration of Ronald W. Busuttil, M.D., board certified in general surgery; the motions of defendants Baldwin, Bernstein, Cooman, Cracchiolo, Galleno, Levensen, Purcell and Tibone, all orthopedic surgeons, were also supported by the declaration of Leonard Marmor, M.D., a board certified orthopedic surgeon; and the motions of defendants Barnett, Carlson, Cassan, Croft, Levy, Kovick,

MacAlpin, Simmons, and Van Herle, whose specialties were rheumatology, internal medicine, respiratory care, cardiology, pulmonary diseases, and endocrinology, were also supported by the declaration of Matthew O. Locks, M.D., who is board certified in internal medicine.

The declarations of the doctor defendants categorically denied the charging allegations of the complaint and declared, inter alia, their specific involvements in the case of Ada Crews Mann, that they were not in the room when she fell on November 1, 1977; that they had not at any time concealed, attempted, or conspired to conceal, any information from anyone regarding the health, care, and/or treatment of her; that services they provided for decedent were not provided for the purpose of artificially inflating her bill or obtaining Medicare or MediCal funds; that they never attempted or conspired to kill Ada Crews Mann, and that, in their opinion, their conduct at all times conformed to the standard of practice in the community relating to the practice of their named specialty.

The declaration of Holly Hoberg declares that her only involvement with the decedent occurred when she and decedent were in an X-ray room on November 1, 1977; that she had never concealed or attempted or conspired to conceal any information from anyone regarding the health, care, and/or treatment of decedent; that the services she had provided to decedent were not for the purpose of inflating her bill or obtaining funds, and that she never attempted or conspired to kill decedent.

An earlier affidavit of Hoberg had been filed in the court's records. It declared that her function at UCLA was to position patients so that X-rays could be taken and then to take X-rays; that she had been positioning Ada Crews Mann's feet for X-rays when she fell on November 1, 1977; and that the allegations of the complaint that Hoberg was a party to a conspiracy to conceal medical facts and that she kept decedent in a drugged state and attempted to kill her were sham, spurious, and scandalous.

The declaration of D. M. Forrester, M.D., a board certified radiologist dated August 28, 1981, declared that she had reviewed copies of the X-rays of decedent taken after her fall on November 1, 1977, and copies of many other listed X-rays and of radiology reports, all of which had the name of Ada Crews Mann on them and were from UCLA. In her opinion, all of "those reports were prepared in conformity with the standard of practice for radiologists in this community." She further states: "To a reasonable degree of medical certainty the November 1, 1977 x-rays do not show any fracture or dislocation. To a reasonable degree of medical certainty I do not believe the patient sustained a fracture of the odontoid process on November 1, 1977 at any time that day prior to the taking of those x-rays. Some of

the reasons for my opinion are: (1) The alignment of C-1 and C-2 is normal; (2) There is no evidence of prevertebral soft tissue swelling, which normally would be present if the patient sustained a fracture of the odontoid process; (3) If the patient had recently sustained a fracture of the odontoid process she would have been in too much pain to rotate her head to the positions required for that series of x-rays."

George Campion, M.D., is director of radiology at St. Joseph Medical Center, Burbank, California. In his deposition, he stated in reference to the November 1 skull X-ray pictures of decedent Ada Crews Mann that ". . . you cannot anatomically rule it out [a fracture of the odontoid process] on radiographic method, although the fact that she can turn her neck for the positioning of the skull X/rays, it is unlikely that she does have a fracture at this time," and that, if her odontoid had been fractured on that date, ". . . I don't think the patient would have been able to turn her neck in order to position her head for these lateral views." Campion also stated that he had not formulated an opinion as to whether any of defendant Doctors Arndt, Bassett, Bein, Bennett, Bernstein, Bohman, Drake, Feigenbaum, Friedman, Gold, Levine, Manger, Morton, Russell, Scanlon, Schmidt and Weiner had failed to comply with the standard practice relating to radiology in relation to decedent Ada Crews Mann and that he had never told anyone that any of those doctors had failed to comply with the standard of practice.

The declaration of Dr. Busuttil, supporting the motion of defendant Ferkel, declared that he had reviewed the UCLA Hospital and Clinic's chart pertaining to Ada Crews Mann. In his opinion, the care rendered to her by Richard Ferkel, M.D., conformed to the standard of practice relating to general surgeons in the community in the light of her history and symptoms.

The declaration of Leonard Marmor, M.D., supporting the motions of the orthopedic surgeons declared that he had reviewed the UCLA Hospital and Clinic's chart relating to Ada Crews Mann and copies of numerous listed X-rays pertaining to her, including those of November 1. In his opinion the care rendered to decedent by the eight orthopedic surgeons conformed to the standard of practice for orthopedic surgeons in the community in the light of her history and symptoms.

The declaration of Matthew O. Locks, M.D., supporting the motions of the remaining treating doctors, declared that he had reviewed a copy of the UCLA Hospital and Clinic report pertaining to Ada Crews Mann. Based upon his education, professional background, and review of the above-mentioned records, it was his opinion that the care rendered to Ada Crews Mann by each of those doctors, naming each of them, was appropriate and reasonable, in light of Ada Crews Mann's history and symptoms. The records

reflected that she had a multitude of serious medical problems, including severe rheumatoid arthritis, and that the care and treatment rendered to decedent by those doctors conformed to the standard of practice in the community of internists.

The declaration of defendant Bernard Strohm established that he was the associate director/administrator at UCLA Hospital and Clinics; that he had no contact with Ada Crews Mann and was not aware that she was a patient at UCLA until after the instant lawsuit was filed; and that he never concealed or attempted or conspired to conceal any information from anyone regarding the health, care, and/or treatment of Ada Crews Mann and had never attempted or conspired to kill her.

The declaration of defendant William S. Russell established that he was the data processing manager at UCLA Hospital and Clinics during the relevant period of time. He had no contact with Ada Crews Mann and was not aware that she was a patient at UCLA until after the lawsuit was filed. He had never concealed or attempted or conspired to conceal any information concerning her health or care or medical treatment from anyone and had never attempted or conspired to kill her.

Dr. Fox, plaintiffs' expert, a diplomate of the American Boards of Surgery and of Neurological Surgery, filed a declaration which incorporates his report and may be summarized as follows: A December 21, 1976, X-ray shows no fracture, dislocation, or subluxation of the odontoid. The lateral skull film of November 1, 1977, reveals fracture of the odontoid just below the skull line, and there is no open-mouth view to confirm it. There were no cervical spine films to compare. The X-ray report of November 1 is very sketchy and incomplete and states that the tape was broken.[7] The January 11, 1978, films confirm a fracture-dislocation of the odontoid process. The radiologist, Richard H. Gold, M.D., interpreted this as erosion of the dens secondary to rheumatoid disease. He recommended an open-mouth view, which was never taken, and tomography, which was never obtained. The medical records show repeated complaints of head and neck pain in 1977 and 1978. The September 4, 1978, films confirm the subluxation of C-1 and C-2 with posterior displacement, and this is confirmed by the radiology reports of the UCLA radiology department. Decedent was never treated for the fracture at the UCLA Medical Center.

In Dr. Fox' opinion, after reviewing the medical records and X-rays, the treatment at the medical center was below the standard of practice. It was

---

[7]The radiologist's final report of the November 1 X-rays incorporated in several of defendants' declarations states that decedent fell and the contemplated X-rays could not be completed. It continues [typewriting]: "Skull films were done, however, and there is a . . . [something is written in handwriting but it could not be deciphered]."

below the standard of practice not to discover the fracture and to fail to take cervical spine films on November 1, 1977. Because the earlier films showed no injury, it is reasonable to assume that the fracture occurred when decedent fell on November 1.

Dr. Fox was critical of Dr. Forrester's declaration. Pointing to her statement that the alignment of C-1 and C-2 is normal, he points out that no films of the cervical spine were taken on November 1 and that the January 11 and September 4 films which were of the cervical spine show a fracture dislocation and subluxation of C-1 and C-2. Dr. Fox criticizes Dr. Forrester's reliance on the absence of prevertebral soft tissue swelling, stating that the patient did not have time to develop swelling because the films were taken immediately after the fall. Dr. Fox also criticizes the third reason offered by Dr. Forrester for concluding there was no fracture on November 1—if decedent had sustained a fracture the patient would have been in too much pain to rotate her head to the positions required for the skull X-rays. Dr. Fox states that decedent "obviously did have the films and did not have to rotate her head to obtain laterals or AP's or Towne views, no rotation was needed!"

Dr. Fox also challenges the other nondefendant doctors who filed declarations that the defendant doctors conformed to the standard of practice. He asserts that in view of the history of head injury, the symptoms of neck pain reported in the nurse's notes, and respiratory distress, the orthopedic surgeons should have evaluated the patient's neck. Dr. Fox also asserts internal medicine specialists and other respiratory specialists, in view of the symptoms, should have been alert to cervical damage. Finally, he challenges the general surgeon's declaration, asserting that it is inappropriate for a general surgeon to determine the standard of care for arthritic specialists and a cardiologist.

■ The summary judgment procedure, inasmuch as it denies the right of the adverse party to a trial, is drastic and should be used with caution. (*Eagle Oil & Ref. Co.* v. *Prentice* (1942) 19 Cal.2d 553, 556 [122 P.2d 264].) ■ Summary judgment is properly granted only when the evidence in support of the moving party establishes that there is no issue of fact to be tried. (Code Civ. Proc., § 437c; *Lipson* v. *Superior Court* (1982) 31 Cal.3d 362, 374 [182 Cal.Rptr. 629, 644 P.2d 822].)

■ "The moving party bears the burden of furnishing supporting documents that establish that the claims of the adverse party are entirely without merit on any legal theory." (*Lipson* v. *Superior Court, supra,* 31 Cal.3d at p. 374.) ■ ■ "The affidavits of the moving party are strictly construed and those of his opponent liberally construed, and doubts as to the

propriety of summary judgment should be resolved against granting the motion." (*Slobojan* v. *Western Travelers Life Ins. Co.* (1969) 70 Cal.2d 432, 436-439 [74 Cal.Rptr. 895, 450 P.2d 271]. **(13)** ". . . [I]ssue finding rather than issue determination is the pivot upon which the summary judgment law turns." (*Walsh* v. *Walsh* (1941) 18 Cal.2d 439, 441 [116 P.2d 62].)

■ The courts require only that physicians and surgeons exercise in diagnosis and treatment that reasonable degree of skill, knowledge, and care ordinarily possessed and exercised by members of the medical profession under similar circumstances. (*Bardessono* v. *Michels* (1970) 3 Cal.3d 780, 788 [91 Cal.Rptr. 760, 478 P.2d 480, 45 A.L.R.3d 717].) ■ In deciding whether physicians and surgeons have met this standard, the trier of fact may infer failure of the practitioner to have done so in cases in which the happening of the accident does not normally occur in the absence of negligence. While other cases may require expert testimony to establish the standard of care, such cases do not. (*Id.*, at pp. 788-793.)

■ The trier of fact may infer negligence from the factual statements of Dr. Fox. His declaration that the November 1 X-ray shows the fracture and the radiology report fails to show the fracture would warrant the trier of fact upon reviewing the X-rays to conclude that the radiologists were negligent in not observing what was apparent from the X-rays and taking appropriate action.[8] Moreover, Dr. Fox's declaration clearly undermines the factual basis for Dr. Forrester's declaration which forms the basis of the radiologists' motions for summary judgment.

The trier of fact could also infer that in common X-ray procedures the patients do not fall in the absence of negligence and that when patients do fall, the person positioning the patient is probably the person responsible.

In addition, according to Dr. Fox, the radiologist reports of January 11 and September 4 reflect a problem as to C-1 and C-2 and recommend further procedures. The recommended procedures were not done. A trier of fact without expert testimony as to the standard of care could infer that failure to follow the recommendations constituted negligence. An excuse for failure to follow the recommendations might require testimony as to the standard of care, but no excuse has been offered. Without expert testimony as to the standard of care, the trier of fact upon viewing the January 11 and September 4 X-rays in the light of Dr. Fox' declaration that they show the fracture

---

[8]Alternatively, if the radiologists did observe the fracture but failed to report it because they ran out of tape, the trier of fact without expert testimony on the standard of care could infer that the failure to report constituted negligence.

could infer, depending upon their viewing of the X-rays, that the radiologists should have identified a fracture and were negligent in not observing it. Accordingly, entirely apart from his statements as to the standard of care, Dr. Fox' declaration contained factual assertions which if accepted would permit a finding of negligence and it was error for the trial court to reject his declaration on the grounds that it was conclusory.

 In any event, Dr. Fox was competent to testify as to the standard of care. In *Brown* v. *Colm* (1974) 11 Cal.3d 639, 644 [114 Cal.Rptr. 128, 522 P.2d 688], we rejected "an invariable rule which would require in all cases that an expert must have acquired a personal, working knowledge of the standard of care at the precise time when the alleged malpractice occurred." The court reasoned in part: "While a layman may not testify to a fact which he has learned only by reading a medical book, there is no question that a professional physician may rely upon medical texts as the basis for his testimony. (*Healy* v. *Visalia etc. R.R. Co.* (1894) 101 Cal. 585, 591-592 [36 P. 125]; *Hope* v. *Arrowhead & Puritas Waters, Inc.* (1959) 174 Cal.App.2d 222, 230 [344 P.2d 428]; *Brown* v. *Los Angeles Transit Lines* (1955) 135 Cal.App.2d 709, 716 et seq. [287 P.2d 810]; *Forrest* v. *Fink* (1925) 71 Cal.App. 34, 39-40 [234 P. 860].) Wigmore justifies the foregoing distinction by pointing out that a medical doctor possesses a professional experience which gives him a knowledge of the trustworthy authorities and the proper sources of information, as well as a degree of personal observation of the general subject enabling him to estimate the plausibility of the views expressed. Furthermore, he opines, it may be impossible to obtain information on the particular matter except through the reported data. (2 Wigmore on Evidence (1940) § 665b, pp. 784-785.) . . .

"The unmistakable general trend in recent years has been toward liberalizing the rules relating to the testimonial qualifications of medical experts. Thus, whereas a number of earlier cases held that a physician of necessity must possess the skill ordinarily practiced only in the *same* locality (see, e.g., *Trindle* v. *Wheeler* (1943) 23 Cal.2d 330, 333 [143 P.2d 932]), only six years later this requirement was relaxed so that a physician was deemed qualified as an expert if he could testify to the practice in a *similar* community. (*Sinz* v. *Owens, supra,* 33 Cal.2d 749, 756 [205 P.2d 3, 8 A.L.R.2d 757].) Some early cases were unbending in requiring expertise as to the precise injury involved in the litigation, as, e.g., not permitting an autopsy surgeon to testify on urology (*Moore* v. *Belt* (1949) 34 Cal.2d 525 [212 P.2d 509]). Other authorities, however, have permitted variations, as, e.g., a pathologist was qualified to testify as to causes of aseptic necrosis (*Agnew* v. *City of Los Angeles* (1950) 97 Cal.App.2d 557, 566 [218 P.2d 66]); an expert in otolaryngology to testify regarding plastic surgery (*Mirich*

v. *Balsinger* (1942) 53 Cal.App.2d 105 [127 P.2d 639]); a homeopathic physician and surgeon to testify on the degree of care required of a physician educated in the allopathic school of medicine (*Hutter* v. *Hommel* (1931) 213 Cal. 677, 681 [3 P.2d 554]); a pathologist and professor of pathology to testify on the subject of gynecology (*Cline* v. *Lund, supra,* 31 Cal.App.3d at p. 766).

"There are sound and persuasive reasons supporting this trend toward permitting admissibility more readily, rather than rigidly compelling rejection of expert testimony. It is obvious that an overly strict standard of qualification would make it difficult and in some instances virtually impossible to secure a qualified expert witness." (11 Cal.3d at pp. 644-646, fn. omitted.)

The court concluded the determinative issue in each case must be whether the witness has sufficient skill or experience in the field so that his testimony would be likely to assist the jury in the search for the truth, and "no hard and fast rule can be laid down which would be applicable in every circumstance." (11 Cal.3d at p. 645.) Where a witness has disclosed sufficient knowledge, the question of the degree of knowledge goes more to the weight of the evidence than its admissibility. (*Chadock* v. *Cohn* (1979) 96 Cal.App.3d 205, 209 [157 Cal.Rptr. 640].)

Dr. Fox is a diplomate in surgery and neurosurgery, and it would be unreasonable to assume that he does not regularly read X-rays and radiologists' reports and is unfamiliar with the standard of care exercised by radiologists in reading X-rays and preparing reports. In considering the claim that Dr. Fox is not shown competent to testify to the standard of care exercised by the various other specialists, it must be remembered that his challenge is they failed to diagnose the broken neck. The fact that the patient exhibits symptomatology coming within a particular specialty does not mean that there is not disease or injury coming within another specialty. A specialist must be alert to such possibilities and the need to consult other specialists. The specialist treating respiratory problems, in other words, must be alert to the possibility that the respiratory problems are caused in whole or in part by spinal dislocations and be prepared to call in neurosurgeons when proper diagnostic procedures so require.

Defendants argue that as a surgeon and neurosurgeon Dr. Fox has qualifications not possessed by the other specialists, that a higher standard of care would be applicable to a neurosurgeon than to doctors engaged in other specialties, and that his declaration as to the standard of care could be rejected on the basis that he is in a sense overqualified. However, a neurosurgeon is obviously aware not only of the practice of his speciality but

also the symptomology which leads other specialists to treat patients coming within his speciality and to refer patients to neurosurgeons.

 Defendants rely on authorities that hold that the qualification of an expert is ordinarily a matter addressed to the sound discretion of the court and its ruling will not be disturbed unless a clear abuse is shown. (*Chadock v. Cohn, supra,* 96 Cal.App.3d 205, 208.) However, the court will be deemed to have abused its discretion if the witness has disclosed sufficient knowledge of the subject to entitle his opinion to go to the jury. (*Brown* v. *Colm, supra,* 11 Cal.3d 639, 647.) As a diplomate of surgery and neurosurgery, Dr. Fox is qualified to testify as to the standard of care in reading X-rays, in submitting X-ray reports, and in diagnosing, and the court abused its discretion in concluding that there was no proper foundation.

 Defendants also urge that because Dr. Fox was not listed by plaintiffs as one of their experts for trial, he could not be called as a witness at trial (Code Civ. Proc., § 2037 et seq.) and that because the purpose of a summary judgment motion is to determine whether there are any triable issues of fact, the court in ruling on the summary judgment motions was required to disregard Dr. Fox' declaration. At the argument on the summary judgment motions, plaintiffs asserted that they had recently obtained the services of Dr. Fox.[9]

Code of Civil Procedure section 2037.6 provides that the court upon such terms as may be just may permit a party to call an expert witness not included in the list of expert witnesses so long as the court finds that the party made a good faith attempt to list expert witnesses, that the party has given notice to the opposing party in accordance with section 2037.4, and that as of the date of the exchange of lists the party would "not in the exercise of reasonable diligence have determined to call such witness."[10]

---

[9] In their brief, plaintiffs state that they were unable to obtain the neurologist they listed as an expert witness.

[10] Code of Civil Procedure section 2037.4 provides: "A party who is required to exchange lists of witnesses shall diligently give notice to the parties upon whom his or her list was served if, after notice of it, he or she determines to call an expert witness not included in it, and a party shall make available for deposition such expert witnesses as he or she has determined to call and shall immediately make available for inspection and copying all of such expert witness's discoverable reports and writings."

Code of Civil Procedure section 2037.6 provides: "(a) The court may, upon such terms as may be just (including but not limited to continuing the trial for a reasonable period of time and awarding costs and litigation expenses), permit a party to call a witness, or permit a witness called by a party to testify to an opinion or data on direct examination, during the party's case in chief where such witness, is required to be, but is not, included in such party's list of expert witnesses so long as the court finds that such party has made a good faith effort to comply with Sections 2037 through 2037.3, inclusive, that he has complied with Section 2037.4, and that as of the date of exchange he: [¶] (1) Would not in the exercise

Because the trial court might choose to grant relief, the court ruling on the motions for summary judgment could not assume that it would not.

For the foregoing reasons, we conclude that the court could not properly reject Dr. Fox' declaration on the grounds it stated. This does not mean that the summary judgment motions must be denied as to all defendants. Because the judge rejected Dr. Fox' declaration for all purposes, he had no occasion to reach the further issue that the declaration was sufficient to give rise to issues of fact as to some defendants but not others. Although Dr. Fox states generally that the physicians should have been alerted to the fracture on the basis of certain X-rays and the patient's complaints and symptoms, it is apparent that many of the defendants were not involved in the reading of the X-rays reflecting the fracture, and the declaration does not specify the particular complaints or symptoms or indicate when they occurred. The statements that the doctors generally should have been alerted to the fracture are obviously conclusionary and do not furnish a basis for denial of the summary judgment motions made by individual doctors. Upon remand, the judge should consider as to each defendant whether there is a factual basis for liability shown by Dr. Fox' declaration or any additional declaration that may be filed.

## PUNITIVE DAMAGES

The summary judgment on the punitive damages issues must be sustained. Dr. Fox' declaration at most makes out a case for medical malpractice and does not justify the claim for punitive damages. There is no evidence of a conspiracy to conceal, of intentional performance of useless operations or of attempt to kill. At most all that was shown in opposition to the motions was a failure to observe, report or diagnose. Such failure does not establish intentional misconduct.

## DR. NACHMAN

Summary judgment was properly entered in favor of Dr. Nachman on March 4, 1981. His declaration may be summarized: Dr. Nachman specializes in the field of anesthesiology and examined decedent once for the purpose of determining her suitability for anesthesia for an operation. The operation was postponed, and he did not administer anesthesia. He did not order any X-rays or interpret or consult any previous X-rays. He did not

---

of reasonable diligence have determined to call such witness; or [¶] (2) Failed to determine to call such witness through mistake, inadvertence, surprise, or excusable neglect.

"(b) In making a determination under this section, the court shall take into account the extent to which the opposing party has relied upon the list of expert witnesses and will be prejudiced if the witness is called."

enter into any agreement to conceal facts regarding her treatment. In opposition plaintiffs did not offer any expert declarations. There being nothing to indicate that Dr. Nachman should have studied the X-rays, that he was to diagnose decedent's ailments, or that he treated decedent, the summary judgment was properly granted.

## DR. DAVIDSON

 Dr. Davidson's motion for summary judgment was granted on July 15, 1981.[11] His declaration states that he was an intern in the orthopedic department. On October 23, 1978, he cosigned an order made by a Dr. Gausewitz for administration of the drug Lasix, and on October 28, at the decedent's request, he prescribed a sleeping pill, Dalmane. His examination of decedent was limited to that necessary to verify the order of Dr. Gausewitz and to safely prescribe Dalmane. He did not order X-rays or consult or interpret X-rays. He did not conceal any facts and did not take any actions to speed decedent's death. Again, plaintiffs did not offer any expert declarations. The motion was properly granted.

## MOTION TO TAKE JUDICIAL NOTICE

Plaintiffs request this court to take judicial notice of 20 matters. As to a code section and a rule of court, no motion is necessary. Similarly, the issue table in a Court of Appeal brief is also properly before us. The remaining matters all appear to be factual matters which were not called to the court's attention when it ruled on the motions for summary judgment and may not be used to vacate the orders.

## APPEAL FROM POSTJUDGMENT ORDERS

Although plaintiffs appealed from postjudgment orders, they did not in their opening brief specifically attack any of those orders. Accordingly, the appeal from those orders need not be separately considered. (See *Johnston* v. *Board of Supervisors* (1947) 31 Cal.2d 66, 70 [187 P.2d 686]; *Henderson* v. *Security Nat. Bank* (1977) 72 Cal.App.3d 764, 769 [140 Cal.Rptr. 388];

---

[11]The summary judgment was not formally entered. It is appropriate to preserve the appeal by amending the summary judgment filed October 26, 1981, to include a judgment for Dr. Davidson in order to establish an appealable judgment, and we so order. (See *Varjabedian* v. *City of Madera* (1977) 20 Cal.3d 285, 289, fn. 1 [142 Cal.Rptr. 429, 572 P.2d 43].)

6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 425, pp. 4391-4393, § 442, pp. 4405-4406.)

The summary judgment of March 4, 1981, in favor of Dr. Nachman is affirmed. The summary judgment filed October 26, 1981, is amended to include a provision denying recovery against Dr. Davidson. That summary judgment as amended is affirmed insofar as it denies recovery for punitive damages and any recovery against Dr. Davidson. In all other respects, the summary judgment filed October 26, 1981, is reversed. Because of our reversal of the latter summary judgment, the postjudgment orders incident to the summary judgment are nullified (6 Witkin, Cal. Procedure, *supra,* Appeal, § 542, pp. 4483-4484), except insofar as one of them relates to punitive damages. To the extent that the postjudgment order relates to the punitive-damages claim, it is affirmed. Drs. Nachman and Davidson shall recover their costs on appeal from plaintiffs and plaintiffs shall recover their costs, other than that portion relating to their appeals from the summary judgment in favor of Drs. Nachman and Davidson, from the remaining respondents.

Mosk, J., Kaus, J., Reynoso, J., Grodin, J., and Lucas, J., concurred.

**BIRD, C. J.,** Concurring.—I write separately because I believe it is important to clarify the effect of a stay of "all proceedings" for future litigants. (See maj. opn., *ante,* at pp. 27-28.) In cases where a stay is in effect when a motion is noticed, the stay should "stop the clock" from running either toward a hearing date or toward a date on which opposition papers are due. Any other rule permits the clock to run toward conditional, uncertain dates, leaving the nonmoving party unclear as to when opposition must be filed and when an appearance must be made. It is unfair to allow the moving party to profit from such uncertainty.

Here, hearing on a motion for summary judgment was noticed for October 15th. Both parties agree that the stay order would have prevented the trial court from hearing the motion on that date unless it was lifted. The law and motion judge clearly informed all parties that while moving papers could be *filed* in his department, no *hearing* could be held unless the stay order were dissolved.

Under the terms of the local rule,[1] the filing of defendants' motions made plaintiffs' opposition due three to five days before the noticed hearing date.

---

[1] See majority opinion, *ante,* at page 27.

Yet the stay rendered both the hearing date and, a fortiori, the deadline for filing an opposition entirely speculative at the time notice was given. The hearing could not go forward on the 15th unless an intervening event—the dissolution of the stay—occurred.

Plaintiffs argue that a stay of "all proceedings" not only bars a court from hearing a motion, but also the parties from filing any notice of motion. Alternatively, they argue that if a filing were allowed, a stay order would toll any period which would otherwise begin to run when the motion was filed. If a stay is in effect, a party may not file a motion and thereby create a deadline for an opponent which carries adverse consequences.

Judicial definitions of the term "proceeding" might well have led plaintiffs to believe that either interpretation of the stay order was correct. "The term 'proceeding' may refer not only to a complete remedy (see [Code Civ. Proc.,] § 23) but also to a mere procedural step that is part of a larger action or special proceeding. [Citations.]" (*Rooney* v. *Vermont Investment Corp.* (1973) 10 Cal.3d 351, 367 [110 Cal.Rptr. 353, 515 P.2d 297].) Arguably, the term includes steps taken by the parties as well as by a court. In *Lukes* v. *Logan* (1884) 66 Cal. 33 [4 P. 883], the term was held to encompass the settlement of a bill of exceptions between two parties in preparation for a motion for a new trial. Citing *Lukes* with approval in *Stonesifer* v. *Kilburn* (1892) 94 Cal. 33, 43 [29 P. 332], this court observed that " '[t]he word [proceeding] is generally applicable to *any step taken by a suitor* to obtain the interposition or action of a court.' " (Italics added, citation omitted.)

In *Burns* v. *Superior Court* (1903) 140 Cal. 1 [73 P. 597], the term "proceedings" was held to include the issuance of a subpoena by a notary at the request of one party seeking to depose another. (*Id.*, at p. 9.) Though a trial court does not act directly in deposition proceedings, *Burns* viewed a deposition as "a means furnished by law for the use of the court for the purpose of enabling it to obtain the evidence . . . ." (*Ibid.*) Thus, "[t]he taking of a deposition is as clearly one of the 'proceedings' of the court as was the taking of testimony before the master or examiner in a suit in equity." (*Ibid.*)

As *Burns* noted, "[t]he word 'proceeding' necessarily has different meanings, according to the context and the subject to which it relates. . . . In section 473 of the Code of Civil Procedure, and in similar statutory provisions of other states, it has a broader signification, and includes any step taken in a case, whether by the court or by one of the parties thereto. [Citations.] '*In its more general sense, in law, it means all the steps or*

*measures adopted in the prosecution or defense of an action.'* [Citation.]"
(*Burns, supra,* 140 Cal. at pp. 5-6, italics added.)

In light of these holdings, a nonmoving party could reasonably have concluded that a stay of "all proceedings" prohibited his opponent from noticing a hearing date or creating a deadline for the filing of opposition. Such notice is a prerequisite to having the motion heard. (Code Civ. Proc., § 1010.) Like the subpoena in *Burns,* the notice is the means by which the parties are brought before the court. Like the settlement of a bill of exceptions, the notice is a " 'step taken by a suitor to obtain the interposition or action of a court.' " (*Stonesifer* v. *Kilburn, supra,* 94 Cal. at p. 43.) Logically, it is a "proceeding" which is stayed by a stay of "all proceedings."

The case law is not the only source which could lead a nonmoving party to believe that a hearing or opposition due date is inoperative if a stay is in effect. Conditional dates are by their very nature inadequate notice. Here, the October 15th hearing date was a conditional one. The hearing could not proceed as noticed unless the stay were dissolved. A fortiori, the deadline for plaintiffs to file their opposition was conditional and uncertain when the notice was given.

This ambiguity as to the deadline for filing an opposition should not be construed against the nonmoving party. This is particularly true with summary judgment, which is so final a remedy. The moving party should not be able to take advantage of his opponent's uncertainty as to the date on which his opposition papers must be filed. Furthermore, given the short time available to prepare an opposition even when the noticed deadline is an operative one, any uncertainty about the deadline could be critically unfair to the responding party.

"It is academic that the burden is on the party moving for summary judgment; because of the drastic nature of the remedy sought, he is held to strict compliance with the procedural requisites." (*Department of General Services* v. *Superior Court* (1978) 85 Cal.App.3d 273, 284 [147 Cal.Rptr. 422].) One "procedural requisite" for any motion is that the notice of motion specify the date on which the motion will be heard. (Code Civ. Proc., § 1010.) A notice which specifies only a conditional hearing date and, therefore, fixes a conditional date for filing opposition papers, does not constitute "strict compliance with the procedural requisites."

To prevent such problems in the future, this court should make it clear that a stay of "all proceedings" tolls *any* deadlines which come into existence while a stay is in effect. A stay does not necessarily bar a party from filing a motion, but a moving party should be required to renotice any

hearing date which was conditional at the time of the original notice. Such a rule would prevent a moving party from profiting from an ambiguity created by his own action and would ensure that the rules of fair notice to an opponent are respected.