[No. B015038. Second Dist., Div. Two. May 28, 1986.]

TIMOTHY A. MILLER, Plaintiff, Cross-Defendant and Respondent, v. ROSE K. SILVER et al.,
Defendants, Cross-complainants and Appellants;
TIMOTHY A. MILLER, M.D., INC., Cross-defendant and Respondent.

**COUNSEL**

Robert M. Silver and Rose K. Silver, in pro. per., for Defendants, Cross-complainants and Appellants.

Early, Maslach, Leavey & Nutt, Horvitz & Levy, David S. Ettinger and Joan Wolff for Plaintiff, Cross-defendant and Respondent and Cross-defendant and Respondent.

## OPINION

**COMPTON, J.**—In 1981, Dr. Timothy A. Miller, a plastic surgeon, commenced a lawsuit in municipal court against his patient Rose Silver to collect $1,827 in fees past due for reconstructive surgery involving a breast prosthesis implant.[1] Thereafter, Rose and her husband Robert, an attorney, appearing in propria persona, filed a cross-complaint for medical malpractice against Dr. Miller and his professional corporation. The couple sought general damages in the sum of $5 million. Since the cross-complaint exceeded the jurisdictional limit of the municipal court, the matter was accordingly transferred to the superior court. There, Dr. Miller filed a motion for summary judgment against the cross-complainants. The trial court granted the motion. The Silvers now appeal. We reverse.

Essentially, the cross-complaint alleged that the doctor misrepresented the degree of pain and scarring entailed in the operation. It also charged that because of Dr. Miller's purported negligence, Rose's body rejected the prosthesis requiring her to endure two more painful implant operations. The pleading further alleged that Robert suffered damages from the loss of his wife's comfort, society, and affection (i.e., loss of consortium).

Dr. Miller's motion for summary judgment was accompanied by a declaration made by one Dr. Benjamin F. Edwards, a member of the American Society of Plastic and Reconstructive Surgery and a diplomate of the American Board of Plastic Surgery. Dr. Edwards also has specialized in plastic and reconstructive surgery since 1951 and has authored or co-authored 12 articles on the subject. In his declaration, Dr. Edwards stated that after reviewing the pertinent medical records, it was his judgment that Dr. Miller's "care and treatment of rose [*sic*] K. Silver was within the standard of care for plastic and reconstructive surgery as it existed in 1979." He further declared that the postoperative complications experienced by her were common accepted risks of implant surgery and that the results achieved by Dr. Miller were good "from a cosmetic standpoint."

The Silvers' initial opposition papers did not include a declaration by a medical expert. Rather, Robert submitted his own declaration stating that Rose had consulted with one Dr. Lawrence Birnbaum, a diplomate in the American Board of Plastic and Reconstructive Surgery, who allegedly charged that Dr. Miller committed malpractice by utilizing the wrong implant and by failing to administer antibiotics prior to surgery. Dr. Birnbaum further

---

[1]In July 1978, Rose had a modified radical mastectomy of her left breast. Her recovery was complicated by thrombophlebitis and the occurrence of a pulmonary embolism. She was treated with a blood-thinning drug. Unfortunately, the treatment resulted in massive uterine hemorrhaging which required an emergency hysterectomy.

purportedly stated that the Silvers would not be able to get any plastic surgeon in the Los Angeles area to testify against Dr. Miller. The Silvers also opposed Dr. Edwards' declaration on the grounds that his expert opinion was made without first examining Rose. In response, Dr. Miller objected to Robert's declaration as based on hearsay and lacking a foundation demonstrating that he was competent to testify as to the appropriate standard of care in a medical malpractice action. The trial court granted the Silvers a one-month continuance in order for them to obtain supplemental declarations.

The Silvers next filed the declaration of one Dr. Frederick Nystrom, a Diplomate of the American Board of Psychiatry and Neurology and a member of the Southern California Psychiatric Society. According to his declaration, Dr. Nystrom "consulted" with Rose during "a series of sessions for the purpose of establishing an understanding of the facts and circumstances surrounding her surgeries." According to him, Rose's body rejected the prosthesis in June 1979. Subsequently, she underwent a second operation for a new implant. By August clinically significant infection appeared and Rose was again hospitalized. She was placed on intravenous antibiotics for a week and then discharged. Thereafter, her body once more rejected the prosthesis. In November, a third operation subsequently took place. During this procedure scar tissue encapsulating the prosthesis was removed and a third implant was tried. Apparently the prosthesis has now been accepted by her body and no further complications have developed.

Dr. Nystrom continued as follows: "In my reviews of the hospital records, I have found no evidence that pre-operative antibiotics were provided prior to any of these surgeries. The post operative infection following the procedure of July 17, 1979 and the rejection of the prosthesis following both the surgeries of March 27, 1979 and July 17, 1979, raises the question of whether these negative sequelae might have been precluded by the providing of prophylactic pre-surgical antibiots [sic], and whether this omission constitutes negligence on the part of Dr. Miller. [¶] A review of the medical literature on the topic of antibiotic prophylaxis in surgical procedures concludes that 'postoperative infection can result in substantial morbidity and prolonged hospitalization . . . in clean operations . . . with placement of prostheses, the high morbidity associated with an infection justifies the use of antibiotics even though the risk of infection is small.' ANTIBIOTIC PRO-PHYLAXIS IN SURGICAL PROCEDURES, a Critical Analysis of the Literature, Drs. Guglielmo, Hohn, Koo, Hunt, Sweet, & Conte Jr., Archives of Surgery, August 1983, pgs. 943 et seq."

Dr. Nystrom further stated that he had consulted with one Dr. Barry Warshaw, the chief physician of the California Board of Medical Quality

Assurance, who opined that on the basis of Rose's medical history she had an increased risk of postsurgical infection. Dr. Warshaw allegedly also stated that since 1979 he has used prophylactic antibiotics with all of his surgical patients.

Dr. Nystrom also stated that in his opinion Rose had not given her informed consent because Dr. Miller failed to provide her with sufficient information about the extent and nature of the reconstructive surgery.

He concluded: "It is my opinion that Dr. Miller failed to meet the standard of care for Plastic and Reconstructive Surgery as it existed in 1979 by failing to provide to the patient pre-surgical antibiotics in the light of her identifiable status as a high risk surgical patient with a multiplicity of life threatening surgical complications in the preceding year."

Thereupon, Dr. Miller objected to Dr. Nystrom's declaration on the grounds that it did not contain sufficient foundational facts. Specifically, Dr. Miller argued that the declarant was incompetent to testify concerning the standard of care in the community of plastic reconstructive surgeons since his declaration did not demonstrate the proper credentials and experience in the field. Secondly, he assailed Dr. Nystrom's opinion because the declarant's research only divulged that while some doctors preferred to utilize prophylactic antibiotics, it did not establish that failure to prescribe them before reconstructive surgery fell below the appropriate standard of care.

The trial court sustained Dr. Miller's objection and continued the hearing for ten days to allow the Silvers the opportunity to obtain the declaration of Dr. Warshaw. When the Silvers failed to submit the declaration, the trial court struck from the record Dr. Nystrom's declaration and granted the motion for summary judgment.

On appeal, the Silvers contend that a medical doctor, albeit one whose specialty is psychiatry, is competent to testify to the standard of care appropriate for a plastic surgeon. Of course, Dr. Miller takes the contrary position. He further contends that the Silvers' appeal has been taken from a nonappealable order.

We first address Dr. Miller's procedural argument. The record on appeal does not reveal that a final judgment was entered against the Silvers. Generally, an order granting a motion for summary judgment is not appealable. Code of Civil Procedure section 904.1 states that, except in the case of a very few and specifically described orders, an appeal lies only from a final judgment. However, "'[w]hile the order is nonappealable and the record does not disclose that any judgment was ever entered pursuant

thereto, judicial expediency dictates that we reach the merits of the appeal and we therefore treat the order as a rendition of judgment (rule 2(c), Cal. Rules of Court).' [Citation.]" (*Lieding* v. *Commercial Diving Center* (1983) 143 Cal.App.3d 72, 74 [191 Cal.Rptr. 559].)

■ It is also generally true, as Dr. Miller contends, that "[W]here the defendant cross-complains against the plaintiff, dismissal of the cross-complaint is a nonappealable ruling on pleadings." (9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 54, p. 76.) "[T]he reason for the rule is that an 'action normally proceeds to a single judgment on the issues raised by the complaint and cross-complaint, and there is no need for nor right to a separate final judgment on the cross-complaint.' [Citation.] Second, the appealability of the orders sustaining the demurrer and dismissing the cross-defendants is merely suspended pending final determination of the rights of the parties in respect to the underlying complaint. Thus, it is 'no more harsh than any case where a party is forced to stand trial because of an erroneous ruling of a trial court.' [Citation.] Finally, the fragmentation of an action during the pleading and proof stages on the trial level could delay the expeditious handling on the trial level and clog up the appellate courts by piecemeal appeals." (*Lemaire* v. *All City Employees Assn.* (1973) 35 Cal.App.3d 106, 110 [110 Cal.Rptr. 507].)

■ However, in the instant appeal the single judgment rule is inoperative because the order on the cross-complaint was *final* as to Robert who was *not* a named defendant in Dr. Miller's action. A cross-complaint is sufficiently independent "to allow a separate final judgment to be entered upon it . . . [when the] order on the cross-complaint may be considered final as to some of the parties." (*Lemaire* v. *All City Employees Assn., supra,* 35 Cal.App.3d 106, 109.) Moreover, because Rose's cause of action for malpractice is inextricably intertwined with her husband's claim for loss of consortium, judicial economy dictates that her appeal as well is properly before us.

We next consider the substantive issue raised by Dr. Miller of permitting a psychiatrist to testify concerning the standard of care in plastic surgery.

■ "The courts require only that physicians and surgeons exercise in diagnosis and treatment that reasonable degree of skill, knowledge, and care ordinarily possessed and exercised by members of the medical profession under similar circumstances." (*Bardessono* v. *Michels* (1970) 3 Cal.3d 780, 788 [91 Cal.Rptr. 760, 478 P.2d 480, 45 A.L.R.3d 717].) ■ "Ordinarily, the standard of care required of a doctor, and whether he exercised such care, can be established only by the testimony of experts in the field.

[Citations.] 'Where, however, negligence on the part of a doctor is demonstrated by facts which can be evaluated by resort to common knowledge, expert testimony is not required since scientific enlightenment is not essential for the determination of an obvious fact.' [Citation.]'' (*Hurn* v. *Woods* (1982) 132 Cal.App.3d 896, 901 [183 Cal.Rptr. 495].)

Code of Civil Procedure section 437c, subdivision (d) provides, "Supporting and opposing affidavits or declarations [to a motion for summary judgment] shall be made by any person on personal knowledge, shall set forth admissible evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.''

█ Whether a witness is competent to testify as an expert is a matter addressed in the first instance to the sound discretion of the trial court. (*Brown* v. *Colm* (1974) 11 Cal.3d 639, 647 [114 Cal.Rptr. 128, 522 P.2d 688].) Its discretion, however, will be deemed abused if the witness has disclosed sufficient knowledge of the subject to entitle his opinion to go before the trier of fact. (*Ibid.*)

The test to determine whether a person is qualified to testify as an expert in a medical malpractice action has been liberalized since our Supreme Court in *Sinz* v. *Owens* (1949) 33 Cal.2d 749 [205 P.2d 3, 8 A.L.R.2d 757] held that the witness must possess "occupational experience" in the defendant-doctor's field. Citing from its decision in *Brown* v. *Colm, supra,* 11 Cal.3d 639, the Supreme Court recently stated in *Mann* v. *Cracchiolo* (1985) 38 Cal.3d 18, 37-38 [210 Cal.Rptr. 762, 694 P.2d 1134] as follows:

"[W]e [reject] 'an invariable rule which would require in all cases that an expert must have acquired a personal, working knowledge of the standard of care at the precise time when the alleged malpractice occurred.' The court reasoned in part: 'While a layman may not testify to a fact which he has learned only by reading a medical book, there is no question that a professional physician may rely upon medical texts as the basis for his testimony. [Citations.] Wigmore justifies the foregoing distinction by pointing out that a medical doctor possesses a professional experience which gives him a knowledge of the trustworthy authorities and the proper sources of information, as well as a degree of personal observation of the general subject enabling him to estimate the plausibility of the views expressed. Furthermore, he opines, it may be impossible to obtain information, on the particular matter except through the reported data. [Citation.] . . . [¶] 'The unmistakable general trend in recent years has been toward liberalizing the rules relating to the testimonial qualifications of medical experts. Thus,

whereas a number of earlier cases held that a physician of necessity must possess the skill ordinarily practiced only in the *same* locality [citation], only six years later this requirement was relaxed so that a physician was deemed qualified as an expert if he could testify to the practice in a *similar* community. [Citation.] Some early cases were unbending in requiring expertise as to the precise injury involved in the litigation, as e.g., not permitting an autopsy surgeon to testify on urology [citation]. Other authorities, however, have permitted variations, as, e.g., a pathologist was qualified to testify as to causes of aseptic necrosis [citation]; an expert in otolaryngology to testify regarding plastic surgery [citation]; a homeopathic physician and surgeon to testify on the degree of care required of a physician educated in the allopathic school of medicine [citation]; a pathologist and professor of pathology to testify on the subject of gynecology [citation]. [¶] 'There are sound and persuasive reasons supporting this trend toward permitting admissibility more readily, rather than rigidly compelling rejection of expert testimony. It is obvious that an overly strict standard of qualification would make it difficult and in some instances virtually impossible to secure a qualified expert witness.' [Citation.] [¶] The court concluded the determinative issue in each case must be whether the witness has sufficient skill or experience in the field so that his testimony would be likely to assist the jury in the search for the truth, and 'no hard and fast rule can be laid down which would be applicable in every circumstance.' [Citation.]" (*Mann v. Cracchiolo, supra,* 38 Cal.3d 18, 37-38; italics in original.)

The *Mann* court then stated, "Where a witness has disclosed sufficient knowledge, the question of the degree of knowledge goes more to the weight of the evidence than its admissibility." (*Id.,* at p. 38.)

According to his declaration, Dr. Nystrom is a 1962 graduate of the Northwestern University Medical School. Between 1962 and 1963 he participated in a rotating internship at Framingham Union Hospital where he trained in medicine, emergency room medicine, surgery, obstetrics, gynecology, pediatrics, and infectious disease. From 1963 to present he has had extensive training in the field of psychiatry. Dr. Nystrom described his practice of medicine and pyschiatry as "based on a holistic and comprehensive understanding of the total patient." He further declared that he has "testified in the Superior Court [*sic*] concerning the total consequences of personal injuries and [has] qualified as a medical expert on each such occasion."

We have no hesitancy to find that Dr. Nystrom lacks the credentials to permit him to give expert testimony concerning the surgical technique of

those physicians schooled in the highly specialized field of plastic surgery. ■ However, in light of the relaxation of the rule governing the qualification of expert witnesses, we do think that Dr. Nystrom, by virtue of his medical education and internship training, possesses the ability to research the role prophylactic antibiotics play in implant patients who have experienced life-threatening complications from recent surgery. Where the allegations of negligence concern matters within the knowledge and observation of every physician and surgeon and "not to a special course of treatment to be tested by the teachings and doctrines of a particular school," the testimony of a non-specialist physician can still aid the trier of fact in its search for the truth. (See *Mirich* v. *Balsinger* (1942) 53 Cal.App.2d 103, 117-118 [127 P.2d 639].)

It must be remembered that nothing we have said prevents Dr. Miller from vigorously cross-examining Dr. Nystrom at trial. As stated by our Supreme Court in *Brown* v. *Colm, supra,* 11 Cal.3d 639, 646: "On the other hand, if the threshold test of general testimonial qualifications is found to be met and the witness is permitted to testify on direct examination, he is subject to as penetrating a cross-examination as the ingenuity and intellect of opposing counsel can devise. This inquiry may challenge not only the knowledge of the witness on the specific subject at issue, but also the reasons for his opinion and his evaluation of any written material upon which he relied in preparation for his testimony. (Evid. Code, § 721.) Further, a defendant is free to argue that the witness' testimony is not entitled to acceptance or credibility because he lacks personal acquaintance with the subject at the time the alleged negligent act occurred, and defendant may produce his own witnesses in rebuttal. These measures are more than adequate to protect a defendant's interests."

■ Lastly, we disagree with Dr. Miller's contention that the Silvers' opposition papers do not raise a triable issue of material fact because the authority relied on by Dr. Nystrom did not expressly state that failure to prescribe prophylactic antibiotics was far below the standard of care. "The summary judgment procedure, inasmuch as it denies the right of the adverse party to a trial, is drastic and should be used with caution." (*Mann* v. *Cracchiolo, supra,* 38 Cal.3d 18, 35.) Therefore, "'[t]he affidavits of the moving party are strictly construed and those of his opponent liberally construed, and doubts as to the propriety of summary judgment should be resolved against granting the motion.'" (*Id.,* at pp. 35-36.) Under this principle, the authority relied on by Dr. Nystrom raises a reasonable inference of malpractice, and hence a triable issue exists as to whether Dr. Miller's treatment of his patient fell below the appropriate standard of care.

The trial court abused its discretion in striking Dr. Nystrom's declaration.

The judgment is reversed.

Roth, P. J., and Gates, J., concurred.