Filed 6/3/24  Eco Property Group v. Snider Investments CA2/6

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SIX

| | |
|---|---|
| ECO PROPERTY GROUP, LLC,<br><br>    Plaintiff, Appellant, and Cross-Defendant<br>v.<br>SNIDER INVESTMENTS, LLC,<br><br>    Defendant, Respondent, and Cross-Complainant<br><br>ROGER MACFARLANE, et al.,<br><br>    Appellants, Cross-Complainants, and Cross-Defendants<br><br>BRENT BUHRMAN,<br><br>    Appellant and Cross-Defendant<br><br>MORONGO EQUITY PARTNERS I, LLC,<br><br>    Appellant, Cross-Complainant, and Cross-Defendant | 2d Civ. No. B318564<br>(Super. Ct. No. 19CV04971)<br>(Santa Barbara County)<br><br><br>ORDER DENYING REHEARING AND MODIFYING OPINION [NO CHANGE IN JUDGMENT] |

THE COURT:

The petition for rehearing is denied. The opinion filed herein on May 6, 2024, is modified as follows:

1. The last paragraph at the bottom of page 32, commencing with "We need not determine" and ending on page 33 with "(*People v. Watson* (1956) 46 Cal.2d 818.)," is modified to read:

We need not determine whether the court's finding was erroneous. Appellants have not shown that, if erroneous, the finding resulted in a miscarriage of Justice. (*People v. Watson* (1956) 46 Cal.2d 818.) "A 'miscarriage of justice' occurs when it is "' . . . reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.""" (*Lundy v. Ford Motor Co.* (2001) 87 Cal.App.4th 472, 479.) In view of the trial court's finding, supported by substantial evidence, that appellants had fraudulently induced the Snider parties to enter into the three agreements, it is not reasonably probable that appellants would have achieved a more favorable result had the court found the general release provision to be unenforceable against them.

2. Immediately after the above paragraph as modified herein, and before the section on page 33 entitled, "*Cross-Complaint of Appellants MacFarlane, Newby, Owens, and Walker Against Buhrman*," the following new section is added:

*Appellants' Petition for Rehearing*

In their petition for rehearing, appellants state that they "seek rehearing because the opinion fails to address Appellants' arguments that the integration clauses in the Lease and the Operating Agreement *bar the Snider Parties' fraud claims*."

(Italics added.)  Appellants contend: "On rehearing, this court should address this issue and conclude that the integration clauses are fatal to those fraud claims."  "By . . . agreeing to the integration clauses, Snider is precluded as a matter of law from claiming that (i) the alleged misrepresentations were material, (ii) that he actually relied on them and (iii) that the reliance was reasonable."  "Despite multiple mentions of the integration[] clauses in [appellants'] opening brief, the Snider Parties completely ignored those arguments . . . ."

In their opening brief appellants note that both the lease and Operating Agreement "contain[] an integration clause whereby the parties confirm that all material information relied on by the parties is contained in" those agreements.  But in their opening brief appellants do not contend that the integration clauses *barred* the Snider parties' fraudulent inducement claims.  Appellants have therefore forfeited this issue.  (*Christoff v. Union Pacific Railroad Co.* (2005) 134 Cal.App.4th 118, 125 ["an appellant's failure to discuss an issue in its opening brief forfeits the issue on appeal"]; *McCann v. City of San Diego* (2021) 70 Cal.App.5th 51, 82, fn. 17 ["we need not address claims not properly addressed in the opening brief"]; *Reichardt v. Hoffman* (1997) 52 Cal.App.4th 754, 764 [""Obvious considerations of fairness in argument demand that the appellant present all of his points in the opening brief . . ."""].)

Furthermore, appellants' arguments concerning the integration clauses are forfeited because they were not presented under a separate heading or subheading in the opening brief.  "California Rules of Court, rule 8.204(a)(1)(B), provides that a brief must '[s]tate each point under a separate heading or subheading summarizing the point, and support each point by

3

argument and, if possible, by citation of authority.' 'Failure to provide proper headings forfeits issues that may be discussed in the brief but are not clearly identified by a heading.'" (*Herrera v. Doctors Medical Center of Modesto, Inc.* (2021) 67 Cal.App.5th 538, 547.)

In any event, the integration clauses do not bar the Snider parties from claiming fraud. "A party may claim fraud in the inducement of a contract containing a provision disclaiming any fraudulent misrepresentations and introduce parol evidence to show such fraud. [Citations.] Fraud in the inducement renders the entire contract voidable, including any provision in the contract providing the written contract is, for example, the sole agreement of the parties, that it contains their entire agreement and that there are no oral representations (integration/no oral representations clause)." (*Hinesley v. Oakshade Town Center* (2005) 135 Cal.App.4th 289, 301)

There is no change in the judgment.

GILBERT, P. J.          YEGAN, J.          CODY, J.

Filed 5/6/24 Eco Property Group v. Snider Investments CA2/6 (unmodified opinion)

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| ECO PROPERTY GROUP, LLC,<br>    Plaintiff, Appellant, and Cross-Defendant<br>v.<br>SNIDER INVESTMENTS, LLC,<br>    Defendant, Respondent, and Cross-Complainant<br><br>ROGER MACFARLANE, et al.,<br>    Appellants, Cross-Complainants, and Cross-Defendants<br><br>BRENT BUHRMAN,<br>    Appellant and Cross-Defendant<br><br>MORONGO EQUITY PARTNERS I, LLC,<br>    Appellant, Cross-Complainant, and Cross-Defendant | 2d Civ. No. B318564<br>(Super. Ct. No. 19CV04971)<br>(Santa Barbara County) |

This complex case concerns two complaints, three cross-complaints, two cross-appeals, and nine parties. The parties are:

1. Property owner Morongo Equity Partners I, LLC (Morongo).

2. Snider Investments, LLC (SIL), which was the sole member of Morongo when it was formed.

3. David Snider, who formed SIL and is its sole member. Snider decided to develop Morongo's property as a commercial cannabis cultivation facility and lease it to a cannabis cultivator.

4. ECO Property Group, LLC (ECO). ECO purchased a 20-percent membership interest in Morongo. The sole members of ECO are Roger MacFarlane and Eli Owens.

5. MacFarlane, Owens, Scott Newby, Brent Buhrman, and Gary Walker, Jr. They purported to form a limited liability company (LLC) that leased property from Morongo for the purpose of the commercial cultivation of cannabis. After the termination of the lease, the LLC purported to sign a settlement agreement with Morongo. But the LLC did not exist.

The trial court bifurcated the proceedings into two phases. The first phase was a court trial of the three cross-complaints – one filed by SIL, the second by Morongo, and the third by MacFarlane, Owens, Newby, and Walker. The second phase will be either a court or jury trial of the two complaints. The present appeal concerns only the first phase.

Five parties appeal from the judgment entered in the first phase. The appellants are ECO, MacFarlane, Owens, Walker, and Newby. Two parties – SIL and Morongo – moved to dismiss ECO's appeal because the first-phase judgment is not a final judgment as to ECO. Instead of dismissing ECO's appeal, we treat it as a petition for an extraordinary writ.

In the first phase the trial court found in favor of SIL and Morongo on their cross-complaints. At their request, the court rescinded three agreements because it determined that MacFarlane, Owens, Newby, Walker and Buhrman had fraudulently induced them to sign the agreements. We reject appellants' claim that substantial evidence does not support the court's finding of fraudulent inducement. We do not reweigh the evidence on appeal. We also reject appellants' claim that the attempted rescission of one of the agreements was ineffective.

The cross-complaint filed by MacFarlane, Owens, Walker, and Newby was against Brent Buhrman and Morongo. The cross-complaint alleged that Buhrman had violated confidentiality agreements and that Morongo had breached a contract. The trial court found in favor of Buhrman and Morongo.

The trial court did not award prevailing-party attorney fees based on contractual attorney fee provisions. (Civ. Code, § 1717.) Buhrman and Morongo cross-appeal from the phase-one judgment's denial of their request for attorney fees. We conclude that on this issue the trial court erred. We reverse the first-phase judgment to the extent it denied Buhrman's and Morongo's request for attorney fees. We remand the matter for further proceedings on this issue. In all other respects, we affirm the phase-one orders.

*Statement of Facts*

Division Six opinions normally include a statement of facts summarizing the material evidence presented at the court trial. But the facts of this case are voluminous and complex. A detailed recitation of the facts is not necessary to resolve appellants' claims.

3

At the beginning of its statement of decision, the trial court set forth the evidence as presented in the trial brief submitted by Snider, Morongo and SIL. The court fully credited their version of events, which it summarized as follows:

"In 2016, with California's impending legalization of cannabis on the horizon, a . . . group of partners [MacFarlane, Owens, Walker, Newby, and Buhrman], self-described as a 'dream team' of 'master cannabis cultivators' and known as [']Seed to Soul,['] sought to lock up indoor cannabis cultivation space so that they would not miss out on the oncoming 'green rush.' They found a landlord, [Morongo], whose sole member was SIL, [which] was developing such a space from the ground up. [The sole member of SIL was David Snider.] By spinning a tall tale about their purported qualifications and their access to endless amounts of financing from one of their team members [MacFarlane], [the Seed to Soul partners] tricked [Morongo] into leasing to them and selling [20 percent] of [its] company to [ECO, MacFarlane's and Owens' LLC,] instead of leasing the space to one of the many large, institutional, and established cannabis cultivators who had expressed interest in leasing the same space. . . . [T]heir representations were false, and their post-execution conduct demonstrated that they had neither the intent nor the capability of carrying out large scale cannabis cultivation operations. Instead, once [ECO] had purchased a portion of [Morongo's] company which was sold as part of the lease transaction, [the Seed to Soul partners] manufactured a construction dispute and terminated the lease . . . . After threatening a lawsuit concerning the termination, they then used their misrepresentations to extract a settlement agreement [from Morongo, the lessor,] despite the fact that their entity [the Seed

4

to Soul lessee, which purported to be an LLC,] had never been formed, had no legal capacity, and did not exist. Eventually, the founder of this 'dream team,' Brent Buhrman, realized that he too had been swindled by his partners whom he had brought into the deal, so he came clean to the landlord and revealed the truth of what had transpired – that the team was not who they represented themselves to be and, among other things, never had any of the funding they had claimed to have or the capabilities to do the things they said they would do . . . ."

" . . . Owens, MacFarlane, Buhrman, Newby, and Walker . . . fraudulently induced the Snider Parties [Snider, SIL, and Morongo] to enter into three agreements: (i) a commercial lease between the Seed to Soul [partners' purported LLC] and [Morongo] by which the Seed to Soul [partners] would cultivate cannabis at [Morongo's] property . . . ; (ii) a sale of 20% of SIL's 100% membership interest in [Morongo] to Owens and MacFarlane's entity ECO . . . ; and (iii) a settlement agreement between [Morongo] and the Seed to Soul [partners'] non-existent entity called 'Seed to Soul Management, LLC' concerning the unjustified termination of the Lease by the Seed to Soul [partners] . . . ."

*ECO's Direct Complaint*

In September 2019 ECO began the litigation by filing a complaint against SIL and its sole member, Snider. In December 2021 ECO filed the operative first amended complaint (the direct complaint), consisting of 13 causes of action.

The direct complaint alleged that the parties had entered into an agreement concerning the property "located at 13310 Little Morongo Rd, Desert Hot Springs," hereafter "the Property." The Property would be used "for the development of cannabis

5

cultivation facilities." The Property is owned by Morongo, previously known as Southern California Cultivation Partners, LLC. "Snider controlled, managed, dominated, and operated SI[L] and [Morongo] . . . ." He "[i]s the only manager and member of SI[L]."

"Pursuant to the Agreement," ECO is a member of Morongo with a 20 percent interest. The other member is SIL with an 80 percent interest. Snider and SIL are the "managers" of Morongo.

"[ECO] invested . . . $1,100,000 . . . into [Morongo] for purposes of providing capital for the construction of a building on the Property for commercial lease for cannabis cultivation. Pursuant to the Agreement and representations made by Snider and [SIL] to [ECO], [SIL] would also provide a contribution of $4,632,000 . . . for the development of the Property."

Snider and SIL "breached the Agreement by engaging in . . . [specified] intentional acts in knowing violation of the Agreement . . . ." In its prayer for relief, ECO requested general, special, and punitive damages as well as attorney fees.

*ECO's Derivative Complaint*

At the same time that ECO filed the direct complaint, it filed a second complaint as a "derivative action[] on behalf of [Morongo]" against Snider, SIL, and five Snider-related defendants. Morongo was named as a "Nominal Defendant." We refer to this second complaint as "the derivative complaint." It consists of 11 causes of action.

*SIL's Cross-Complaint*

SIL filed a cross-complaint against ECO, MacFarlane, and Owens. The cross-complaint alleged: "In February 2015, SIL purchased the [P]roperty . . . ." "In April 2016, SIL formed [Morongo] and was its sole member and one of its managers

6

pursuant to [Morongo's] original Operating Agreement." SIL transferred title to the Property to Morongo.

Owens, MacFarlane, and Buhrman negotiated an agreement with Snider whereby a partnership called "Seed to Soul Farms" (Seed to Soul) would lease a portion of the Property for the purpose of cultivating cannabis. In addition, the partnership would purchase a 20 percent interest in Morongo. The Seed to Soul partners were MacFarlane, Owens, Buhrman, Walker, and Newby, hereafter collectively referred to as "the Seed to Soul partners."

"[T]he Seed to Soul partners agreed [among themselves] that even though they were not prepared to do anything, they would represent to Mr. Snider that they were an established 'dream team' of 'master cultivators' of cannabis, that had all of the necessary funding *already in place* and would be ready to commence cannabis cultivation operations on Day 1 if they were given a lease for [the Property] and that they would be one of the largest cannabis cultivators in the state of California. Even though none of this was true, the Seed to Soul partners wanted to tie up the [Property] with a signed lease and then would try and figure things out on the run after the fact."

During the negotiations, "the lease and the [Seed to Soul partners'] purchase [of a 20 percent interest in Morongo] were discussed together and as a 'package deal.'" Snider required the purchase so that the Seed to Soul partners would have "'skin in the game.'"

Only two partners – MacFarlane and Owens – provided funds for the purchase of the 20 percent interest in Morongo. The purchase price was $1,100,000. The actual purchaser was ECO, "an entity of which only Mr. Owens and Mr. MacFarlane were

7

members." The terms of the arrangement between Morongo and ECO are set forth in Morongo's "First Amended and Restated Operating Agreement" (the Operating Agreement).

The lease of the Property was signed in June 2016. At Buhrman's request, the name of the tenant was changed from "Seed to Soul Farms" to "Seed to Soul Management, LLC." Buhrman, Walker, and Newby "signed the Lease on behalf of 'Seed to Soul Management, LLC' . . . . Unbeknownst to [SIL and Morongo], no such entity existed." Snider signed the lease on behalf of Morongo.

Before the lease was signed, Buhrman, Owens, and MacFarlane "represented to Mr. Snider that Mr. MacFarlane *had already* invested $500,000 directly into Seed to Soul and would invest an additional $500,000 thereafter in order to ensure Seed to Soul's financial viability . . . ." But these representations were false. "With no funding, Seed to Soul Management, LLC never got formed, never opened any bank accounts, and never sought or applied for any insurance policies. In e-mail communications between the partners of Seed to Soul, Mr. MacFarlane specifically told other Seed to Soul partners to intentionally conceal each of these facts from Mr. Snider."

"In the fall of 2017, a dispute arose between Seed to Soul and [Morongo] as to the type of HVAC [heating, ventilation, and air-conditioning] system that would be installed in" the building under construction on the Property. Morongo "offered to pay 50% of the additional cost of the system that Seed to Soul wanted." Because Morongo refused to pay the entire additional cost, Seed to Soul Management, LLC, gave notice to Morongo that it was terminating the lease.

8

In April 2018 Morongo "entered into a Settlement Agreement with 'Seed to Soul Management, LLC'" concerning the lease. "[A] dispute" subsequently "broke out among the Seed to Soul [partners], which led to Mr. Buhrman terminating the Seed to Soul partnership. Feeling that his former partners had defrauded him, Mr. Buhrman approached Mr. Snider and told him the truth about what had occurred with Seed to Soul and with ECO both before and after the execution of the Lease and Operating Agreement."

Based on the information provided by Buhrman, SIL "learn[ed] that the entire Lease and Operating Agreement had been entered into under false pretenses." Snider notified MacFarlane that SIL was rescinding the Operating Agreement and offered to return the $1,100,000 paid by ECO. MacFarlane "refused to accept the monies."

SIL's cross-complaint consisted of two causes of action. The first sought to rescind the Operating Agreement permitting ECO to purchase a 20 percent membership interest in Morongo. The rescission would be "in exchange for returning to ECO the $1,100,000 previously paid by ECO to purchase" the membership interest. The second cause of action was for fraud.

*Morongo's Cross-Complaint*

Morongo filed a cross-complaint in intervention against the five Seed to Soul partners (Owens, MacFarlane, Buhrman, Walker, and Newby). The allegations of the cross-complaint are similar to the allegations of SIL's cross-complaint. Morongo's cross-complaint also alleged that, after Seed to Soul Management, LLC, had terminated the lease, the Seed to Soul partners "began threatening to take legal action against [Morongo] for the termination." To settle the dispute, Morongo

9

"agreed to pay and did in fact pay, Seed to Soul $345,000, which represented the return of Seed to Soul's $300,000 [security deposit] and other minor consideration." Newby signed the Settlement Agreement on behalf of Seed to Soul Management, LLC. The Seed to Soul partners "never disclosed the fact that Seed to Soul [Management, LLC,] did not exist and as such did not own any claims that it was releasing. Instead, they intentionally deceived [Morongo] into believing that the Settlement Agreement would result in the release of claims held by the non-existent [limited liability company]."

Morongo's cross-complaint consisted of four causes of action. The first was for fraudulently inducing Morongo to lease the Property to Seed to Soul Management, LLC. The second was for fraudulently inducing Morongo to sign the Settlement Agreement. The third was for declaratory relief that the lease is void and unenforceable. The fourth cause of action was for declaratory relief that the Settlement Agreement is void and unenforceable.

The cross-complaint's prayer for relief requested that the lease and Settlement Agreement be rescinded, that the Seed to Soul partners return the $345,000 paid by Morongo pursuant to the Settlement Agreement, and that they pay Morongo "damages that would put [it] back into the position it would have been [in] had the Lease never been entered into."

*Cross-Complaint of Owens, MacFarlane, Newby and Walker*

Four of the Seed to Soul partners – Owens, MacFarlane, Newby, and Walker – filed a cross-complaint against Morongo and Buhrman. The cross-complaint consisted of seven causes of action. They included a cause of action for Morongo's breach of

10

the Settlement Agreement and causes of action for Buhrman's breach of confidentiality agreements.

*Trial Court's Phase-One Judgment*

As to phase one, a 13-day court trial was conducted. The court wrote a detailed and thorough statement of decision. It entered "[j]udgment" on the cross-complaints "in accordance with the . . . Statement of Decision."

With the exception of Buhrman, the trial court did not credit the testimony of the Seed to Soul partners. The court found Owens to be "evasive." It said: "[Owens] routinely did not respond to the courtroom in a manner that was credible or believable." As to Newby, the court noted: "[H]is testimony was not consistent or credible; his testimony in the courtroom was different from what he said in his deposition; in summary his testimony was not persuasive of his cause." As to MacFarlane, the court stated: "His testimony was sometimes evasive; elusive; obfuscating." "His testimony was not credible related to his claims on the underlying issues in the three cross-complaints at issue in Phase 1."

On the other hand, the trial court found Snider's testimony "believable; credible; consistent" and "certainly supportive of his theory of the case." "His testimony was very persuasive."

The court noted that Buhrman had "'rolled over' on his former partners and colleagues. He was a 'rogue partner." The court found his testimony "intellectually honest; . . . believable; credible" and "very persuasive."

On SIL's and Morongo's cross-complaints, judgment was entered in favor of the cross-complainants. The court concluded that SIL's and Morongo's "evidence is preponderating; additionally, . . . it is clear and convincing."

11

The court found that the Seed to Soul partners and ECO had "*fraudulently induced* [SIL and Morongo] *to enter into three agreements AND the evidence reached the level required for rescission . . . .*" The three agreements are the Operating Agreement, the lease of the Property, and the Settlement Agreement between Morongo and Seed to Soul Management, LLC.

The court stated: "In order to induce [Morongo] to sign the Lease and SIL to sell a portion of its membership interest in [Morongo] to ECO, the five Seed to Soul [partners] fraudulently represented to SIL and [Morongo] that they were comprised of a 'dream team' of 'master cultivators' with the capability of getting licensed and carrying out large scale Cannabis cultivation at the [Morongo] property; [in fact] the 'dream team' was an unproven team with no track record." In addition, Owens, MacFarlane, and Buhrman "fraudulently represented that [Owens and MacFarlane] had already funded Seed to Soul with $1,000,000 for startup and operational capital, and that they would continue to fund the venture as needed to ensure its success."

Moreover, "[t]hey fraudulently represented that the Seed to Soul [partners] would be prepared to commence Cannabis cultivation at the property by April 2017, and they would take all steps necessary to do so, including by starting the State and local licensing application process, and by ordering equipment, supplies, and inventories that had long lead times. [¶] [] All the Seed to Soul [partners] . . . fraudulently represented that they were committed to Seed to Soul's long-term success, and that they would work towards its success."

The court further found "that the Seed to Soul [partners had] fraudulently induced [Morongo] to enter into the Settlement

12

Agreement by making affirmative material representations that they knew to be false, including that Seed to Soul Management LLC was a 'California Limited Liability Company' with 'members' and 'managing members.[']"  In fact, Seed to Soul Management LLC was a "non-existent entity."

The court ordered that the Operating Agreement, lease, and Settlement Agreement are rescinded.  "'Rescission extinguishes the contract [citation], terminates further liability, and restores the parties to their former positions by requiring them to return whatever consideration they have received. [Citation.]  Thus, the "[r]elief given in rescission cases— restitution and in some cases consequential damages—puts the rescinding party in the *status quo ante,* returning him to his economic position before he entered the contract."'"  (*Wong v. Stoler* (2015) 237 Cal.App.4th 1375, 1386.)

As to the rescission of the Operating Agreement, the court ordered Morongo or SIL to return to ECO its $1,100,000 investment in Morongo as well as "$10,000 that ECO [had] contributed to [Morongo] as a capital call in April 2018."

As to the rescission of the Settlement Agreement, the court ordered the Seed to Soul partners to "forthwith" return to Morongo the $45,000 it had paid them as "additional consideration" pursuant to the Settlement Agreement.  The court did not expressly order the Seed to Soul partners to return to Morongo the $300,000 security deposit it had refunded to them pursuant to the Settlement Agreement.  But the rescission of the Settlement Agreement required them to return the security deposit to Morongo.  (See *Rodriguez v. Barnett* (1959) 52 Cal.2d 154, 161, italics added ["Rescission extinguishes a contract [citation] and *requires* each party to return whatever he has

13

received as consideration thereunder [citation]. As a matter of law the defendant would therefore be required to return the $1,500 deposit to the plaintiffs upon rescission"].) The trial court found that the Settlement Agreement had "damaged" Morongo because, but for the agreement, "it would have applied [the security deposit] to damages [incurred] as a result of the Seed to Soul [partners'] breach of the Lease."

As to the cross-complaint of Owens, MacFarlane, Newby, and Walker, judgment was entered for the cross-defendants (Morongo and Buhrman) on all counts.

*Appeal and Cross-Appeals*

ECO and four of the Seed to Soul partners – MacFarlane, Owens, Newby, and Walker – appeal from the phase-one judgment. They are hereafter collectively referred to as "appellants." A single opening brief was filed on behalf of all appellants. Morongo and Buhrman cross-appeal from the phase-one judgment. Both cross-appeals are limited to the issue of attorney fees. A combined respondents' brief and cross-appellant's opening brief was filed on behalf of Morongo and SIL. Buhrman filed a separate combined respondent's brief and cross-appellant's brief.

*Motion to Dismiss ECO's Appeal*
*Based on the One Final Judgment Rule*

"Civil cases in California are governed by the "'one final judgment'" rule, which 'prohibits review of intermediate rulings by appeal until final resolution of the case.' [Citation] . . . The rationale for the rule ""is that piecemeal disposition and multiple appeals in a single action would be oppressive and costly, and that a review of intermediate rulings should await the final

14

disposition of the case.""""" (*Reddish v. Westamerica Bank* (2021) 68 Cal.App.5th 275, 277.)

Before appellants' opening brief was filed, SIL and Morongo moved to dismiss ECO's appeal from the phase-one judgment entered on the cross-complaints. They claimed that, as to ECO, the phase-one judgment is nonappealable because a final judgment will not be rendered until phase two of the trial has been completed. Phase two will involve the trial of ECO's direct and derivative complaints against Snider, SIL, and other Snider-related defendants.

"Where [as here] a complaint and cross-complaint involving the same parties have been filed, there is no final, appealable judgment until both have been resolved. [Citation.] . . . [¶] [Thus,] [u]nder the one final judgment rule, [ECO arguably] could not have appealed from the judgment as to the cross-complaint[s] while proceedings remained pending as to its [direct and derivative] complaint[s]. [ECO] could appeal only from a final judgment which resolved both the complaint[s] and the cross-complaint[s]." (*ECC Construction, Inc. v. Oak Park Calabasas Homeowners Assn.* (2004) 122 Cal.App.4th 994, 1002.) In their response to the motion to dismiss ECO's appeal, appellants acknowledge that the appeal "is almost certainly from a non-final judgment."

We deferred resolution of the motion "pending completion of the briefing for this appeal." In their respondents' brief, SIL and Morongo no longer seek the dismissal of ECO's appeal: "Notwithstanding the prior Motion for Involuntary Dismissal, because the parties have now fully briefed the issues, [we] urge this Court to assume jurisdiction over ECO's appeal of the Phase One Judgment . . . ." SIL and Morongo argue that ECO may

15

appeal from the judgment on the cross-complaints because the judgment "fully adjudicated" ECO's direct and derivative complaints. They reason that both complaints are based on the Operating Agreement, which is unenforceable because the trial court ordered the agreement rescinded. Therefore, ECO is not entitled to any relief on the complaints. (See *Westamerica Bank v. MBG Industries, Inc.* (2007) 158 Cal.App.4th 109, 132-133, italics added ["a judgment is not final and not appealable when it decides the issues in a cross-complaint but not the issues in a complaint, unless the cross-complaint sought separate and independent relief by or against different parties, or *the judgment or order on the cross-complaint leaves no issues to be determined as to one party*"].)

We agree that the judgment on the cross-complaints fully adjudicated ECO's derivative complaint. In its direct complaint ECO alleged that, "[p]ursuant to the [Operating] Agreement, [ECO] and SI[L] are the members of [Morongo]." The rescission of the Operating Agreement means that ECO lacked standing to bring the derivative action on behalf of Morongo because it was never a member of the limited liability company. (*DuBeck v. California Physicians' Service* (2015) 234 Cal.App.4th 1254, 1264 ["Rescission extinguishes a contract, rendering it void *ab initio,* as if it never existed"].) "[B]oth contemporaneous membership and continuous membership are required for a plaintiff to have standing in a derivative action on behalf of an LLC." (*Sirott v. Superior Court of Contra Costa County* (2022) 78 Cal.App.5th 371, 383.)

On the other hand, it is uncertain whether the phase-one judgment fully adjudicated ECO's direct complaint. In their motion to dismiss ECO's appeal, SIL and Morongo assert,

16

"During Phase Two, if ECO is able to survive the demurrer stage, there are *13 undecided causes of action in ECO's* [direct] *Complaint . . . .*"

Appellants insist that, as to ECO's direct complaint, "[u]nresolved claims remain pending between appellant ECO and respondent SIL." Appellants note that ECO's direct complaint alleges causes of action against SIL for fraudulent concealment and fraudulent misrepresentation. Appellants contend that "whether SIL committed fraud *against* ECO is a Phase Two issue that has not yet been tried or decided. Phase One only concerned whether ECO committed fraud against SIL."

In its statement of decision the trial court said, "Even if there is a finding of rescission of the Operating Agreement, that does not eliminate the need for Phase 2. Mr. Snider received 1.1 million dollars [from ECO], used that money to build a building; then once he built the building, he sold that building, used 2.7 million dollars to pay for another building, and then sold that building for 12 million dollars . . . ; so there are significant equitable claims that would then need to be decided in Phase 2 if . . . the contract is deemed to be rescinded and invalidated."

During appellate oral argument, counsel for SIL and Morongo claimed that, if we affirm the phase-one judgment, the rescission of the Operating Agreement will preclude the trial court from conducting phase two. Counsel for appellants insisted that there must be a phase two irrespective of whether the Operating Agreement is rescinded. This is a matter for the trial court to determine. Nothing we say in this opinion should be construed as expressing our view on the issue.

SIL and Morongo request that, if we conclude ECO's complaints were not "effectively adjudicated by the Phase One

17

Judgment," we should "consider ECO's Notice of Appeal as [a petition for] an extraordinary writ." "An appellate court has discretion to treat a purported appeal from a nonappealable order as a petition for writ of mandate, but that power should be exercised only in unusual circumstances. [Citation.] . . . [¶] In *Olson v. Cory* (1983) 35 Cal.3d 390 . . . , the Supreme Court determined it was appropriate to treat an appeal from a nonappealable order as a petition for an extraordinary writ where requiring the parties to wait for a final judgment might lead to unnecessary trial proceedings, the briefs and record included in substance the necessary elements for a proceeding for a writ of mandate, there was no indication the trial court would appear as a party in a writ proceeding, the appealability of the order was not clear, and all the parties urged the court to decide the issue rather than dismiss the appeal. [Citation.] The court concluded that dismissing the appeal rather than exercising its power to reach the merits, would be ""unnecessarily dilatory and circuitous."" [Citation.]' [Citation.] [¶] . . . Many of these considerations are present here." (*H.D. Arnaiz, Ltd. v. County of San Joaquin* (2002) 96 Cal.App.4th 1357, 1366-1367.)

Moreover, as we explain in the next section of this opinion, the phase-one judgment operates as a final appealable judgment as to Morongo and the five Seed to Soul partners. These parties have also appealed from the judgment. Their appeals and ECO's appeal are inextricably intertwined. Many of the issues that Morongo and the Seed to Soul partners raise on appeal are the same issues raised by ECO in its appeal. The factual background is the same. ECO and four Seed to Soul partners have jointly filed appellate briefs. In the interest of judicial economy and to ensure consistent appellate rulings, we should resolve the issues

18

as to all of the parties in a single opinion.  (See *CAZA Drilling (California), Inc. v. TEG Oil & Gas U.S.A., Inc.* (2006) 142 Cal.App.4th 453, 465 ["Where the issues involved in an appeal are 'inextricably intertwined' with claims raised by a party still involved in litigation at the trial court level, 'judicial economy' permits that party to join in the appeal"]; *Miller v. Silver* (1986) 181 Cal.App.3d 652, 658 (*Miller*) ["because [wife's] cause of action for malpractice is inextricably intertwined with her husband's claim for loss of consortium, judicial economy dictates that her appeal as well is properly before us"].)

Accordingly, we deem SIL and Morongo to have withdrawn their motion to dismiss ECO's appeal from the phase-one judgment.  We exercise our discretion to treat ECO's appeal as a petition for an extraordinary writ.  "To exercise our mandatory jurisdiction over [the Seed to Soul partners' and Morongo's] appeals, . . . but also defer consideration of [ECO's similar] contentions [in its appeal from the phase-one judgment], would further the very fragmentation and multiplicity of appeals that the final judgment rule seeks to avoid."  (*California Dental Assn. v. California Dental Hygienists' Assn.* (1990) 222 Cal.App.3d 49, 60.)

### *Finality of Phase-One Judgment as to Parties Other than ECO*

In contrast to ECO, the phase-one judgment constitutes a final appealable judgment as to the Seed to Soul partners and Morongo.  SIL and Morongo acknowledge "that the trial court's Phase One Judgment is a final judgment adjudicating all claims between SIL and [Morongo] on the one hand; and [the five Seed to Soul partners] on the other.  Those parties have no remaining claims between each other in Phase Two . . . ."  The same is true

19

as to the claims between Buhrman and the four other Seed to Soul partners.  (See *Smith v. Smith* (1962) 209 Cal.App.2d 343, 344 [cross-complainant may appeal from judgment on cross-complaint "when the judgment . . . finally disposes of the action as to the appellant"]; *Miller, supra*, 181 Cal.App.3d at p. 658 ["A cross-complaint is sufficiently independent 'to allow a separate final judgment to be entered upon it . . . [when the] order on the cross-complaint may be considered final as to some of the parties'"].)

There are no remaining claims between Morongo and ECO. Morongo is not a party to ECO's direct complaint against SIL and Snider.  We previously noted that "the judgment on the cross-complaints fully adjudicated ECO's derivative complaint" on behalf of Morongo.  (*Ante*, at p. 17.)

*Adequacy of Trial Court's*
*Findings in Statement of Decision*

During appellate oral argument, appellants' counsel contended that in its statement of decision the trial court had made "inadequate findings" on the fraud claims.  Counsel asserted that for each appellant the trial court had failed to make express findings on the five elements of fraud and explain why the facts supported the findings.  "'The elements of fraud . . . are ([1]) misrepresentation (false representation, concealment, or nondisclosure); ([2]) knowledge of falsity (or "scienter"); ([3]) intent to defraud, i.e., to induce reliance; ([4]) justifiable reliance; and ([5]) resulting damage.'"  (*Lazar v. Superior Court* (1996) 12 Cal.4th 631, 638.)  Counsel claimed that the inadequate findings constitute reversible error.

"Upon the timely request of one of the parties in a nonjury trial, a trial court is required to render a statement of decision

20

addressing the factual and legal bases for its decision as to each of the principal controverted issues of the case. (Code Civ. Proc., § 632.) A statement of decision need not address all the legal and factual issues raised by the parties. Instead, it need do no more than state the grounds upon which the judgment rests, without necessarily specifying the particular evidence considered by the trial court in reaching its decision. [Citations.] '[A] trial court rendering a statement of decision under . . . section 632 is required to state only ultimate rather than evidentiary facts because *findings of ultimate facts necessarily include findings on all intermediate evidentiary facts necessary to sustain them.* [Citation.]' [Citations.] In other words, a trial court rendering a statement of decision is required only to set out ultimate findings rather than evidentiary ones." (*Muzquiz v. City of Emeryville* (2000) 79 Cal.App.4th 1106, 1124-1125, italics added.)

Here, the trial court made the requisite ultimate findings. It found that appellants had "*fraudulently induced the Snider Parties to enter three agreements.*" It described the fraudulent representations in detail. It found that the Snider parties had reasonably relied on the representations. In addition, the trial court found that, "[h]ad the Snider parties known the truth about any of these misrepresentations," they would not have entered into the agreements. Finally, the trial court found that the Snider parties had suffered damages by entering into the agreements. The court expressly rejected appellants' affirmative defenses.

"A trial court's statement of decision must explain 'the factual and legal basis for its decision as to each of the principal controverted issues at trial.' (Code Civ. Proc., § 632.) It will be deemed adequate 'if it fairly discloses the determinations as to

21

the ultimate facts and material issues in the case.'" (*Altavion, Inc. v. Konica Minolta Systems Laboratory, Inc.* (2014) 226 Cal.App.4th 26, 45.) The statement of decision here provided the required fair disclosure. At oral argument appellants' counsel complained that the trial court's findings "were not clear." We perceive no lack of clarity.

*Rescission of Operating Agreement*

The trial court ordered the Operating Agreement rescinded and ordered Morongo "or SIL" to "[r]eturn [to ECO its] $1.1 million [investment in Morongo] forthwith." SIL returned the funds. Nevertheless, appellants contend, "SIL's attempt to rescind the Operating Agreement fails as a matter of law." They explain: "*SIL* cannot restore anything to ECO because SIL did not receive anything of value from ECO – only [Morongo] did." "Because it was only a member of [Morongo], SIL could never return the ECO Initial Contribution. Only [Morongo] could do so, making rescission by SIL impossible."

Appellants' argument elevates form over substance. It does not matter whether Morongo or its sole remaining member, SIL, returned ECO's $1.1 million investment in Morongo. What matters is that the investment was returned to ECO. That the funds came from SIL rather than Morongo does not invalidate the rescission. ECO in effect is saying that it can keep the $1.1 million returned by SIL and remain a member of Morongo until and unless Morongo pays it an additional $1.1 million, which would result in ECO's unjust enrichment.

Moreover, SIL sold to ECO 20 percent of SIL's 100 percent ownership interest in Morongo. The trial court found: "[T]he five Seed to Soul [partners]" had "induce[d] . . . SIL to sell a portion of its membership interest in [Morongo] to ECO." ECO was provided "[t]he opportunity to purchase 20% of [SIL's]

22

membership interest in [Morongo]."  Because SIL sold the membership interest to ECO, SIL was entitled to rescind the Operating Agreement upon its return of the $1.1 million purchase price.

> *Appellants Forfeited Their Claim that No Substantial*
> *Evidence Supports the Finding that the Lease and*
> *Operating Agreement Were Fraudulently Induced*

Appellants contend, "There is no substantial evidence that the Lease [and] Operating Agreement were fraudulently induced."  (Capitalization and underlining omitted.)  "Fraud in the inducement is a subset of the tort of fraud.  It 'occurs when "'the promisor knows what he is signing but his consent is induced by fraud, mutual assent is present and a contract is formed, which, by reason of the fraud, is voidable.'"'"  (*Hinesley v. Oakshade Town Center* (2005) 135 Cal.App.4th 289, 294-295.)

Appellants argue that substantial evidence does not support six allegedly fraudulent representations identified by the trial court in its statement of decision.  The following quotation is an excerpt from appellants' opening brief summarizing the six representations (record citations omitted):

> "• Representation No. 1: '[T]he Seed to Soul [partners] would be prepared to commence Cannabis cultivation at the property by April 2017, and they would take all steps necessary to do so, including by starting the State and local licensing application process, and by ordering equipment, supplies, and inventories that had long lead times.'
> "• Representation No. 2: The Seed to Soul [partners] 'were committed to Seed to Soul's long-term success, and that they would work towards its success.'

23

"• Representation No. 3: Owens and MacFarlane 'would continue to fund the [Seed to Soul] venture as needed to ensure its success.'

"• Representation No. 4: The Seed to Soul [partners] 'were comprised of a "dream team" of "master cultivators" with the capability of getting licensed and carrying out large scale Cannabis cultivation at the [Morongo] property.'

"• Representation No. 5: That Appellants had a 'viable company.'

"• Representation No. 6: That Owens and MacFarlane 'had already funded Seed to Soul with $1,000,000 for startup and operational capital.'" (Underlining omitted.)

"Where findings of fact are challenged on a civil appeal, we are bound by the 'elementary, but often overlooked principle of law, that . . . the power of an appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted,' to support the findings below. [Citation.] We must therefore view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor in accordance with the standard of review so long adhered to by this court." (*Jessup Farms v. Baldwin* (1983) 33 Cal.3d 639, 660.) ""The issue is not whether there is evidence in the record to support a different finding, but whether there is some evidence that, if believed, would support the findings of the trier of fact."" (*Verrazono v. Gehl Company* (2020) 50 Cal.App.5th 636, 652.)

"[I]t is presumed that the evidence is sufficient to support the [court's] factual findings, and it is the appellant's burden to demonstrate that it does not." (*Boeken v. Philip Morris, Inc.* (2005) 127 Cal.App.4th 1640, 1667.) "[A]ppellants who challenge

24

the decision of the trial court based upon the absence of substantial evidence to support it "'are required to set forth in their brief *all* the material evidence on the point and *not merely their own evidence.* Unless this is done the error is deemed waived.". . .'" (*Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1246 (*Nwosu*).)

SIL and Morongo argue that appellants forfeited their substantial evidence claim because their Opening Brief presents only the evidence supporting their case and "omits evidence which the trial court relied upon in reaching its decision." We agree. (*Schmidlin v. City of Palo Alto* (2007) 157 Cal.App.4th 728, 739 (*Schmidlin*) ["failure to present a full and fair summary of the evidence *supporting* the judgment effects a 'waive[r]' of any challenge to the sufficiency of the evidence"].)

"Contrary to fundamental tenets of appellate practice [citation] the facts stated and the inferences drawn in [appellants' briefs] are those most favorable to [appellants] rather than to [SIL and Morongo]. No attempt is made to fairly state all of the evidence as is required. [Citations.] . . . [Appellants' opening brief] constitute[s] merely a challenge to [SIL and Morongo] to set forth or this court to find the evidence [in the 2,495-page reporter's transcript and numerous exhibits] supporting the . . . trial court's judgment. Given this type of presentation the contention that the findings are not supported by substantial evidence may be deemed waived." (*Oliver v. Board of Trustees* (1986) 181 Cal.App.3d 824, 832; see also *Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881.)

In their reply brief appellants contend they did not forfeit their sufficiency of the evidence claim. Appellants dispute SIL's and Morongo's assertion that "'[appellants] only present[]

25

evidence that supports [their] position while ignoring an avalanche of evidence admitted at trial that supports the trial court's findings.'" Appellants give two examples of their presentation of evidence favorable to SIL and Morongo. One is that "Snider testified that Buhrman repeatedly referred to Seed to Soul as a 'Dream Team.'" The other is that appellants "noted that Seed to Soul Management[, LLC,] was never formed as an entity with the Secretary of State." These two examples do not constitute "a full and fair summary of the evidence" favorable to SIL and Morongo. (*Schmidlin*, *supra*, 157 Cal.App.4th at p. 739.)

*Even If Appellants Did Not Forfeit Their*
*Substantial Evidence Claim, the Claim Lacks Merit*

In support of its conclusion that the lease and Operating Agreement had been fraudulently induced, the trial court made six factual findings. Where several findings are attacked by the appellant, "[i]f one finding, supported by substantial evidence, will sustain the trial court's judgment, . . . it will be presumed that the trial court predicated its judgment upon such finding, and questions relative to other findings become immaterial upon appeal." (*Mershon Co. v. Pachmayr* (1948) 88 Cal.App.2d 901, 904; see also *Carlton v. Castranova* (1961) 189 Cal.App.2d 409, 413 (*Carlton*).)

Appellants have failed to show that there is no substantial evidence in support of the trial court's findings that appellants made the third, fifth, and sixth representations and that they were fraudulent. (See *Picerne Construction Corp. v. Castellino Villas* (2016) 244 Cal.App.4th 1201, 1208 [appellants "bear the burden of demonstrating that there is no substantial evidence to support a challenged factual finding"].) The sixth representation was "[t]hat Owens and MacFarlane 'had already funded Seed to

26

Soul with $1,000,000 for startup and operational capital.'" The third representation was that "Owens and MacFarlane 'would continue to fund the [Seed to Soul] venture as needed to ensure its success.'" The fifth representation was that "Appellants had a 'viable company.'" The company could not be viable if it was not funded.

Sufficient evidence supports the trial court's findings as to these representations. Snider testified that, before he signed the lease, Buhrman, Owens, and MacFarlane had told him that MacFarlane "was going to be the . . . money guy who would support the operation financially" and "that they'd already been funded with $1,000,000 injected into the company." Later in his testimony, Snider repeated "that Mr. MacFarlane and Mr. Owens and Mr. Buhrman said that they had already funded Seed to Soul with $1,000,000 prior to the time that the Lease was executed." Buhrman testified that, at the time this representation was made to Snider, Seed to Soul did not even have a bank account into which the funds could have been deposited. Buhrman said he never had "access to any funds from Mr. MacFarlane or Mr. Owens for use by Seed to Soul."

When Buhrman confessed to Snider, he said "that the representations that had been made to [Snider] by [Buhrman] and [Owens] and [MacFarlane] that the entity was funded were false." Snider testified that, if he had known that Seed to Soul had not been funded, "[w]e wouldn't have done the deal." Buhrman testified that, during his negotiations with Snider, "Snider had indicated . . . that this would be a deal breaker for him if the [entity] had not been funded."

In their reply brief appellants assert, "*MacFarlane funded $500,000.*" In support of their assertion, appellants cite lines 3-

10 at volume 5, page 1413 of the reporter's transcript. In this excerpt Owens testified that he and MacFarlane had deposited $500,000 into ECO's bank account: $400,000 from MacFarlane and $100,000 from Owens. (MacFarlane and Owens were the sole members of ECO.) No money was deposited into a Seed to Soul bank account.

It is reasonable to infer that the other Seed to Soul partners – Newby and Walker – knew that Seed to Soul had not been funded and that Snider was unaware of the lack of funding. Newby testified that he had known Seed to Soul did not have a bank account and that he had not conveyed this information to Snider.

Buhrman testified that a bank account was not opened because the LLC was never formed: "There was no way for me to open a bank account because we had no documents from Secretary of State for me to open a business account." Buhrman explained that he could not open a business account without an EIN (Employer Identification Number), and an EIN would not be issued until articles of organization for the LLC had been filed with the California Secretary of State.

When asked why the LLC had not been formed, Buhrman replied: "Mr. Owens had convinced Scott Newby and Gary Walker Junior that . . . to move this million dollars . . . to fund Seed to Soul Management was going to cost him and Mr. MacFarlane money . . . [that would] just sit [in the account] because we didn't have any expenditures at that time and there was no reason to move the money, and so the other two partners [Newby and Walker] said, 'That's fine, don't bother moving the money,' and so I was outvoted by Mr. Owens, Mr. MacFarlane, Scott Newby and Gary Walker to [not] initiate the formation process of [the LLC]."

28

Buhrman testified that the other partners' refusal to form the LLC and open a bank account had caused a "rift" in his relationship with them. MacFarlane and Owens "never put any money in the deal to make it available to be able to have that LLC formed."

In Exhibit 107 Buhrman declared under penalty of perjury: "[A]lthough I obtained bids in late 2016 for insurance for our operations, the other members of the [Seed to Soul] Team refused to act on it and we did not have any funding so I was unable to procure it either. The [Seed to Soul] Team lacked the ability to do anything that it was required to do under the Lease. Mr. MacFarlane indicated on multiple occasions that we should conceal from Mr. Snider the fact that the [Seed to Soul LLC] had not been formed, that no bank account had been opened, and that he had not made the necessary investment [] into [Seed to Soul] . . . ."

The trial court found Buhrman to be a credible witness. Based on his testimony, all the partners knew that the LLC had not been formed, that Seed to Soul was not funded, and that it could not be funded because it did not have a bank account. Accordingly, each of the trial court's findings as to the third, fifth, and sixth fraudulent representations constitutes "'one clear, sustained and sufficient finding upon which the judgment [as to the rescission of the lease and operating agreement] may rest . . . .'" (*Carlton*, *supra*, 189 Cal.App.2d at p. 413.)

### *Appellants Forfeited Their Claim that No Substantial Evidence Supports the Finding that the Settlement Agreement Was Fraudulently Induced*

Appellants claim, "There is no substantial evidence that the Settlement Agreement [concerning the termination of Morongo's

29

lease of the Property to Seed to Soul Management, LLC] was fraudulently induced." (Capitalization and underline omitted.) In its statement of decision, the trial court found "that the Seed to Soul [partners had] fraudulently induced [Morongo] to enter into the Settlement Agreement by making affirmative material representations that they knew to be false, including that Seed to Soul Management LLC was a 'California Limited Liability Company' with 'members' and 'managing members.[']" Another fraudulent representation was that "Seed to Soul Management LLC had the right to and would sue [Morongo] if [it] did not enter into the Settlement Agreement and return the [$300,000] security deposit under the Lease and pay additional consideration of $45,000."

The trial court stated: "Each of these representations [was] false; Seed to Soul Management LLC never existed; it had no capacity to sue or contract and had no viable legal claims that it could assert or that could be released." "[P]rior to making their misrepresentations, the Seed to Soul [partners] and their Counsel knew and discussed internally that [Morongo] would not sign the Settlement Agreement if it found out that Seed to Soul Management LLC had never been formed."

Appellants also forfeited this substantial evidence claim because they failed to set forth in their briefs the material evidence supporting the trial court's finding that the Settlement Agreement had been fraudulently induced. (*Nwosu, supra,* 122 Cal.App.4th at p. 1246; *Schmidlin, supra,* 157 Cal.App.4th at p. 739.)

*Even If Appellants Did Not Forfeit Their Claim that No Substantial Evidence Supports the Finding that the Settlement Agreement Was Fraudulently Induced, the Claim Lacks Merit*

Substantial evidence supports the trial court's finding that the Seed to Soul partners fraudulently induced Morongo to enter into the Settlement Agreement. Appellants do not dispute that the entity that signed the Settlement Agreement – Seed to Soul Management, LLC – never existed. Newby testified that, when he signed the Settlement Agreement on behalf of Seed to Soul Management, LLC, he knew it did not exist. But he never told Snider that it did not exist. Buhrman testified that he had told the other partners that the LLC did not exist.

In Exhibit 107 Buhrman declared under penalty of perjury: "Between December 2017-March 2018, the [Seed to Soul] Team discussed bringing suit for damages against [Morongo] for the termination of the lease in order to try and recover its $300,000 security deposit. One of the challenges that arose during these conversations was the fact that [the Seed to Soul LLC] had not been formed and that as a result, it did not have any capacity to bring suit against [Morongo]. It was decided to also conceal this fact from [Morongo]."

Buhrman continued: "Among the [Seed to Soul] Team, we agreed that the [settlement] payment would be wired to the client trust account of [our attorney] because [the LLC] had never been formed and did not have a bank account and we did not want Mr. Snider to learn of such in fear that he would abandon the settlement negotiations if he learned that Seed to Soul Management, LLC could not sue [Morongo]."

Snider testified that, if he "had known that Seed to Soul Management LLC had never been formed in any jurisdiction," he

31

would not "have entered into this Settlement Agreement." Snider explained, "[T]he only thing anybody was worried about was litigation, and if there never was an entity, and this was all a ruse, I didn't have any fear of litigation, so . . . I wouldn't have entered into this Settlement Agreement. I would have held on to the [$]300,000 [security deposit] to mitigate a fraction of my damages."

Appellants argue that "the alleged misrepresentations [concerning the existence of Seed to Soul Management LLC] were not material to [Morongo's] decision to enter into the Settlement Agreement." But we cannot reject Snider's testimony that they were material. The trial court believed Snider. (See *Daly v. Wallace* (1965) 234 Cal.App.2d 689, 692.)

> *Claim that the Trial Court Erroneously Enforced the*
> *Rescinded Settlement Agreement Against Appellants*

In its statement of decision the trial court found, "The [Seed to Soul partners] have waived, released, and discharged their claims against David Snider, [Morongo], and [SIL] under Paragraph 2.1(a) of the Settlement Agreement." Paragraph 2.1(a) is a general release of all claims. Appellants contend the court's "finding is wrong as a matter of law" because it rescinded the Settlement Agreement. Appellants protest: "[T]he court articulated no legal basis for finding the Settlement Agreement rescinded but also finding its waiver provisions to be selectively enforceable [against them]." "It rescinded the Settlement Agreement to Appellants' detriment but enforced it in favor of the Snider Parties."

We need not determine whether the court's finding was erroneous. Appellants have not shown that, if erroneous, the

32

finding resulted in a miscarriage of justice.  (*People v. Watson* (1956) 46 Cal.2d 818.)

*Cross-Complaint of Appellants MacFarlane,*
*Newby, Owens, and Walker Against Buhrman*

Four Seed to Soul partners – MacFarlane, Newby, Owens, and Walker (hereafter MacFarlane et al.) – filed a cross-complaint against Seed to Soul partner Buhrman.  The cross-complaint alleged that Buhrman had breached two agreements by disclosing to Snider confidential information about the Seed to Soul partnership.  The agreements were "a Memorandum of Understanding dated as of May 23, 2016" (MOU) and "an Interest Purchase Agreement . . . dated as of August 20, 2018" (IPA).  MacFarlane et al. sought damages and a "judgment against Buhrman declaring that he is under a duty to indemnify [them] for the full amount of any judgment rendered against them."

The trial court's ruling in favor of Buhrman included the following five findings:

1. "Buhrman did not breach the confidentiality provisions in the [MOU] and/or [IPA]."

2. Because section "7.06 of the IPA provides that it is an integrated agreement that expressly supersedes 'all' earlier agreements 'with respect to the subject matter' . . . , the IPA is the only legally enforceable agreement between [MacFarlane et al.] and Buhrman."  (MacFarlane et al. acknowledge that "the IPA's indemnity and confidentiality clauses are much 'weaker' than the MOU's indemnity and confidentiality clauses").

3. "Buhrman is not liable to [MacFarlane et al.] for statements to Snider/[Morongo] because they are protected by the Litigation Privilege [of Civil Code section 47, subdivision (b)] and

33

cannot be the basis of a breach of contract claim." They are protected by the litigation privilege because they "were made in anticipation of litigation."

 4. The "'unclean hands' [of MacFarlane et al.] preclude them [from] suing Buhrman for breach of contract."

5. "Since [MacFarlane et al.] are seeking indemnity for claims involving their alleged intentional misrepresentations to [Morongo], [Civil Code section] 1668 bars [their] indemnity claim." Civil Code Section 1668 provides, "All contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law."

MacFarlane et al. argue that "[t]he Trial Court's findings contain numerous errors of law." They contend they "have a valid claim against Buhrman for breaching the MOU, notwithstanding the trial court's legally incorrect ruling that the IPA is the only enforceable agreement . . . ."

We need not evaluate the validity of each of the trial court's five findings. MacFarlane et al.'s claim is untenable because the court also found that appellants had fraudulently induced Morongo and SIL to enter into the lease and Settlement Agreement, and this finding is supported by substantial evidence. Buhrman merely informed Snider of the fraud. Permitting MacFarlane et al. to seek damages or indemnity from Buhrman for his disclosure of their fraud would violate California's public policy barring exemption of "anyone from responsibility for his own fraud." (Civ. Code, § 1668.) MacFarlane et al. cannot use the MOU's confidentiality provision to shift their personal fraud liability to Buhrman. (See *Manderville v. PCG&S Group, Inc.*

34

(2007) 146 Cal.App.4th 1486, 1500 ["It is well-established in California that a party to a contract is precluded under [Civil Code] section 1668 from contracting away his or her liability for fraud"]; *Allstate Ins. Co. v. Hansten* (N.D. Cal. 1991) 765 F.Supp. 614, 616 ["Under California law, no contractual agreement may indemnify anyone from his own fraud"].)

*Buhrman's and Morongo's Cross-Appeal*

*From the Phase-One Judgment*

In its phase-one judgment the trial court awarded Buhrman and Morongo their "costs" as to the cross-complaints on which they had prevailed. But it did not award them their reasonable attorney fees. In their cross-appeals, both Buhrman and Morongo contend the trial court erroneously refused to award them prevailing-party attorney fees based on contractual attorney fee provisions. (Civ. Code, § 1717.)

The pleadings put the trial court on notice that the recovery of attorney fees was an issue in the case. In their cross-complaint against Morongo and Buhrman, the Seed to Soul partners requested contractual attorney fees. In its answer to the cross-complaint, Morongo requested attorney fees. Buhrman requested contractual attorney fees in his answer to the cross-complaints filed by both Morongo and the Seed to Soul partners.

In its statement of decision, the trial court ruled that Buhrman's and Morongo's claim for attorney fees "in their request for a Statement of Decision and Proposed Judgment[] comes vastly too late in this proceeding." The court explained: "[Attorney fee] issues need to be addressed early and systematically in a bench trial. The Court's experience has been attorney fees can be the most important issue of a case . . . . This Court has tried dozens if not hundreds of attorney fee claims.

35

Such fees when raised post trial *is vastly poor case management. . . .* This court has learned a far better case management system [is] for the attorney fee testimony [declarations] to be made *during trial and saying to counsel tell me what your reasonable fee will be if you prevail.* In such a process the Court gets competing declarations and information *that is very useful.* It calls out to the clients and lawyers that there can be very big numbers demanded; it has a definite chilling effect on clients, and it is not uncommon for such cases to settle mid-trial when the clients are confronted by the realization of having to pay a really big fee. . . . When that is all done during trial the Court can easily manage the time necessary to give everyone a chance to be heard; something that is vastly more difficult to do a month after the trial when another case is now occupying the Court's attention." (Brackets for "[declarations]" in original.)

We do not doubt that the trial court's statements are wise and may be a "better" and practical way to manage complex litigation. But, as we explain, the trial court's preferred procedure cannot be equated with waiver of attorneys' fees.

As to Morongo's claim for attorney fees, the court said: "There was no request made in [its] pretrial briefs that a demand for attorney fees was going to be made or what such fees might be." "There was no evidence presented during trial what those fees were." "During trial no testimony was elicited about any specific attorney fee clauses in any specific contract(s)." "The Court had no opportunity to evaluate whether attorney fees could or should be awarded based upon the evidence." "The contracts were all rescinded based upon fraud and [consequently] there are no contracts upon which to award fees . . . ." "The request for attorney fees is barred based upon the principles of judicial

36

estoppel."  "The request that the Court enter 'a Judgment' for an 'attorney fee award' is not supported by the evidence."  "For each and all [of the above] reasons the request[] for attorney fees will be denied."

As to Buhrman's claim for attorney fees, the court said: In his two trial briefs, Buhrman did not mention attorney fees. "*During trial no testimony* was elicited about any specific attorney fee clauses . . . ."  "The Court had no opportunity during the trial to evaluate whether attorney fees could or should be awarded based upon the evidence."  "Buhrman's request for attorney fees is barred based upon the principles of equity including equitable estoppel, waiver and judicial estoppel."  "Buhrman's request . . . that the Court enter 'a Judgment' for an 'attorney fee award' is not supported by the evidence."

"'"'An order granting or denying an award of attorney fees is generally reviewed under an abuse of discretion standard of review; however, the "determination of whether the criteria for an award of attorney fees and costs have been met is a question of law."  [Citations.]'"'  [Citation.]  An issue of law concerning entitlement to attorney fees is reviewed de novo."  (*Carpenter & Zuckerman, LLP v. Cohen* (2011) 195 Cal.App.4th 373, 378.)

Here, the trial court denied Morongo's and Buhrman's request for attorney fees because they did not meet the allegedly required criteria – during the trial, they failed to present evidence of the amount of claimed attorney fees and their entitlement to such fees.  We therefore review the trial court's ruling de novo.  The court erred because the law does not require the presentation of attorney-fee evidence during the trial.

The following legal principles apply to a claim for attorney fees: "It is now well-settled that attorney fees, whether

37

authorized by contract or statute, are recoverable under [Code of Civil Procedure] section 1033.5, subdivision (a)(10) as an element of costs, and rather than claim attorney fees as an element of damages, the proper method to recover attorney fees is as an item of costs awarded upon noticed motion.  [Citation.]  Attorney fees based on a contract provision do not need to be demanded in the complaint." (*Chinn v. KMR Property Management* (2008) 166 Cal.App.4th 175, 194, disapproved on other grounds in *DeSaulles v. Community Hospital of Monterey Peninsula* (2016) 62 Cal.4th 1140, 1158.)  "The amount of fees ultimately owed cannot be known when a complaint is filed; it can only be specified and sought by a noticed *post-trial motion*." (*Cadle Co. v. World Wide Hospitality Furniture, Inc.* (2006) 144 Cal.App.4th 504, 515, italics added; see also *Vacco Industries, Inc. v. Van Den Berg* (1992) 5 Cal.App.4th 34, 55, italics added ["allowable costs under Code of Civil Procedure section 1032 include attorney fees whenever they are authorized by contract . . . .  Such authorized fees are properly fixed by the court in a *post-trial noticed motion*"].)  "A notice of motion to claim attorney's fees for services up to and including the rendition of judgment in the trial court . . . must be served and filed within the time for filing a notice of appeal." (Cal. Rules of Court, rule 3.1702(b)(1).)

Based on the above legal principles, we reject appellants' claim that "[Morongo] and Buhrman waived any right to obtain attorneys' fees by not seeking them during trial." (Bold and capitalization omitted.)  The law allowed Morongo and Buhrman to make a noticed post-trial motion for attorney fees.  Appellants have not referred us to anything in the record showing that, before or during the trial, the court warned the parties that

38

attorney fees would be waived unless the issue was presented and litigated during the trial.

The rescission of the Settlement Agreement, which contained a prevailing-party attorney fee provision, does not bar Morongo from recovering its reasonable attorney fees.[1] "[A]n action for fraud seeking damages sounds in tort, and is not 'on a contract' for purposes of an attorney fee award, even though the underlying transaction in which the fraud occurred involved a contract containing an attorney fee clause. [Citation.] However, where the plaintiff's claim instead seeks rescission based on fraud, the courts have concluded such claim does sound in contract and permits the award of fees." (*Super 7 Motel Associates v. Wang* (1993) 16 Cal.App.4th 541, 549; see also *Reyes v. Beneficial State Bank* (2022) 76 Cal.App.5th 596, 619 ["Courts have determined that actions for rescission or cancellation of a contract may be considered actions 'on a contract' for purposes of [Civil Code] section 1717"].)

Furthermore, "[i]t is now settled that a party is entitled to attorney fees under [Civil Code] section 1717 'even when the party prevails on grounds the contract is inapplicable, invalid, unenforceable or nonexistent, if the other party would have been entitled to attorney's fees had it prevailed.'" (*Hsu v. Abbara* (1995) 9 Cal.4th 863, 870.) Appellants would have been entitled to attorney fees had they prevailed on their breach of contract claims. Accordingly, we reject appellants' contention that

---

[1] The settlement agreement provided: "**ATTORNEYS' FEES**. If any action is commenced to construe this Settlement or enforce the rights and duties set forth herein, then the party prevailing in that action shall be entitled to recover its costs and fees in that action, as well as the costs and fees of enforcing any judgment entered therein."

Morongo is not entitled to attorney fees because its "cross-claim for fraudulent inducement seeking rescission . . . clearly sounds in tort."

Appellants argue: "[Morongo's] and Buhrman's arguments fail because neither of them filed a post-trial motion for attorneys' fees." "Under these circumstances, [Morongo] and Buhrman forfeited any ability to recover attorneys' fees." In view of the trial court's denial of attorney fees in its statement of decision and phase-one judgment, it would have been futile for them to file such a motion. "The law neither does nor requires idle acts." (Civ. Code, § 3532; see also *Glaser, Weil, Fink, Jacobs & Shapiro, LLP v. Goff* (2011) 194 Cal.App.4th 423, 445 ["considerations of judicial economy weigh heavily against requiring (or even allowing) a party to present the same argument repeatedly to a decision maker who has already rejected it"].)

Finally, appellants maintain that Buhrman forfeited his right to recover attorney fees because he "has not developed any argument on appeal as to how he would have been entitled to recover attorneys' fees as a matter of law." We have reviewed Buhrman's briefs and conclude that he developed an adequate argument.[2]

---

[2] In his cross-appellant's reply brief, Buhrman requests that he "be awarded his appellate . . . [attorney] fees as the 'prevailing party' on this appeal." We do not decide this issue here. In the trial court the prevailing parties may request attorney fees on appeal as provided in rule 3.1702 of the California Rules of Court. (See *Serrano v. Unruh* (1982) 32 Cal.3d 621, 637 ["it is established that fees, if recoverable at all— pursuant either to statute or parties' agreement—are available

40

*Disposition*

We deem SIL and Morongo to have withdrawn their motion to dismiss ECO's appeal from the phase-one judgment.  We treat ECO's appeal as a petition for an extraordinary writ.  The petition is denied.

We reverse the trial court's phase-one judgment to the extent it barred Morongo and Buhrman from recovering their reasonable, contractual attorney fees.  The matter is remanded to the trial court with directions to conduct further proceedings on the attorney fees issue consistent with the views expressed in this opinion.  Buhrman and Morongo may file a noticed motion "to claim attorney fees for services up to and including the rendition of judgment in the trial court."  (Cal. Rules of Court, rule 3.1702(b)(1).)

In all other respects, the phase-one judgment is affirmed.  Buhrman is awarded costs on appeal against Owens, MacFarlane, Newby, and Walker.  SIL and Morongo are awarded costs on appeal against ECO, Owens, MacFarlane, Newby, and Walker.

<u>NOT TO BE PUBLISHED.</u>

YEGAN, J.

We concur:

GILBERT, P. J.

BALTODANO, J.

---

for services at trial and on appeal"].)

41

Thomas P. Anderle, Judge

Superior Court County of Santa Barbara

_____

Annigian Ryan and James T. Ryan and Jason D. Annigian; Weinberg Gonser Frost and Shahrokh Sheik, for Eco Property Group, MacFarlane, Owens, Newby and Walker.

Armstrong Law Group and John R. Armstrong, for Brent Buhrman.

Reicker, Pfau, Pyle and McRoy and Alan A. Blakeboro, Robert B. Forouzandeh and Andrew W. Hazlett, for Morongo Equity Partners and Snider Investments.